Donald KATZ, Plaintiff-Respondent,

v.

PULASKI SAVINGS AND LOAN ASSOCIATION, a corporation, Defendant-Appellant.

No. 37297.

Missouri Court of Appeals, St. Louis District, Division Four.

Dec. 28, 1976.

 

Kappel, Neill, Staed & Wolff, C. William Portell, Jr., St. Louis, for defendant-appellant.

Newmark & Baris, Irl B. Baris, Kenneth H. Graeber, St. Louis, for plaintiff-respondent.

NORWIN D. HOUSER, Special Judge.

Suit in equity by Donald Katz, owner of a piece of property on Harris Street in the City of St. Louis, to enjoin Pulaski Savings & Loan Association, holder of a note and deed of trust on the property, from foreclosing the deed of trust. The case was submitted on a stipulation as to the principal facts, supplemented by oral testimony of one witness. The trial court found for plaintiff and permanently enjoined foreclosure provided plaintiff continue to make monthly payments of $133 on the principal balance due Pulaski. Pulaski appealed.

These are the facts, from the stipulation and the oral testimony of witness Noble:

Harvey Noble and Steven Goldman, partners doing business as Eagle Realty Company, acted as managing agents for a number of property owners, including plaintiff. Eagle Realty collected rents, made required payments and remitted net proceeds to the property owners. Pulaski held notes and deeds of trust on six separate properties managed by Eagle Realty, including the Harris Street property. The principal outstanding balances on each of these six loans ran from $2,615 to $8,606. The total principal balance on all six loans was $32,836 as of January 18, 1973. The total monthly payments of principal due Pulaski on these six loans amounted to $510, and the payments were in default. On January 18, 1973 Noble and Goldman entered into a written agreement with Pulaski (drawn by Pulaski's attorney) in which they agreed as "owners" (although their only interest was as managing agents) to pay monthly instalments of $510 on the aggregate principal balance of $32,836. The $510 payments were to be applied solely to principal indebtedness. Pulaski agreed to waive inter-

est on these obligations "as long as Owners make principal monthly payments as set forth herein." Pulaski was given "absolute discretion as to the allocation of the principal payment among the various loans." None of the $510 was to be used for payment of taxes or insurance, which were to be otherwise provided for by owners. Paragraph 7 provided: "Monthly payments shall be made on or about the 15th day of each month and in event of default, Pulaski shall have the option to declare this Agreement in default and Pulaski shall be entitled to enforce each note and Deed of Trust as originally executed and the payments received prior to default shall be applied to said loans at the discretion of Pulaski without waiver of interest or penalties." The agreement specifically provided that it in no way released the obligations of any parties on any of the loans, except that if the entire principal balance of $32,836 was paid under the agreement Pulaski at such time would satisfy the liens of its deeds of trust and assign or mark the notes paid.

The principal balance due on January 18, 1973 on the property involved in this action—the Harris Street property—was $8,606. At the time the written agreement was drawn up Pulaski explained to Noble and Goldman that to pay out the amount owed on the six properties in four years at $510 a month they were designating or specifying that a certain portion of the $510 would be applied to each particular parcel. The amount to be applied to the Harris Street property each month was $133. Noble and Goldman made no objection to this apportionment. After the written agreement was drawn up Pulaski showed Noble and Goldman "a copy of what they had drawn up (with respect to allocation of certain amounts to the various parcels) and (they) agreed to make those payments with those amounts going to each individual piece." For each of these loans Pulaski had previously issued a loan payment book showing payments made and principal balance due. Following execution of the written agreement of January 18, 1973 Pulaski pasted a piece of white paper on the third page of each loan payment book showing the account number, the new payment date, the amount of the payment due each month ($133 in the case of the Harris Street property), and a notation that the payments were due on the first and delinquent on the 15th day of the month. Eagle Realty began making monthly payments of $510 under the agreement and continued to do so until September, 1973, at which time part but not all of the $510 was paid to Pulaski. As time went on some monthly payments were not made on the other five properties, but the full $133 was paid and credited in the loan payment book of the Harris Street property each and every month from January, 1973 through January, 1975. No payments were missed on that property. When the entire amount of $510 was not paid in a particular month Pulaski would credit the other accounts with such payments as were actually received on those accounts.

On February 7, 1975 Pulaski wrote Noble and Goldman, listing the loan accounts on the Harris, Bartmer and Evans Street properties, stating that default had been made in the payments due on these loans; that Pulaski was exercising its right to take over management of these three properties and collection of rents under Paragraph 7 of the deeds of trust securing these loans, and giving notice that foreclosure proceedings would be started immediately. Plaintiff, through his attorneys, tendered a check for $133 on the Harris Street property, for the month of February, 1975, which tender was refused. This action was filed shortly thereafter. Plaintiff is able, ready and willing to continue making monthly payments of $133, providing they are credited to the principal balance due on his note. Plaintiff does not own and has no interest in any of the other five pieces of real property. None of plaintiff's money has ever been applied to any of those five or credited to their accounts.

The only question presented for review is whether the written agreement of January 18, 1973 is singular and entire, or divisible and severable. This is primarily a question of the intention of the parties, to be gathered from the language used, if possible,

and the subject matter of the contract. *Rexite Casting Co. v. Midwest Mower Corp.*, 267 S.W.2d 327, 331 (Mo.App.1954).

■ The subject matter of this agreement is future payments due Pulaski on six defaulting real estate loans being serviced by "owners." Evidently it was to the advantage of owners and Pulaski to combine the principal payments on these six loans into one monthly remittance of $510, representing the total of the monthly payments of principal due on the six loans. For the assurance that owners would make these principal payments over the approximately 4-year period it would take to liquidate the total principal balance due at that rate Pulaski was willing to forego the payment of interest. Pulaski specifically waived interest on the six obligations, as long as owners made the principal payments monthly under the agreement. Under Paragraph 7 of the agreement Pulaski clearly had the option to declare the agreement in default and thereupon to foreclose, without waiver of interest or penalties, in the event of default in the making of the $510 monthly payments, but this was elective—subject to Pulaski's choice. There was no provision that the agreement would be terminated as a matter of course following default in the making of the $510 monthly payments. Rescission was not automatic. The agreement, while clear and unambiguous in most provisions, is obscure and ambiguous in the event of default followed by Pulaski's failure to declare the agreement in default. One option was spelled out but the other side of the option coin was not disclosed. To clear up this ambiguity we may resort to the interpretation placed upon the agreement by the parties themselves, because " * * * the practical construction which the parties themselves place upon an agreement is of considerable significance in ascertaining the meaning of the terms of an ambiguous contract." *Modine Mfg. Co. v. Carlock*, 510 S.W.2d 462, 468 (Mo.1974). What happens in the contingency mentioned is answered by resort to the stipulated facts, from which it appears that when that happened Pulaski did not declare the agreement of January 18, 1973 in default,

or elect to terminate it, or foreclose on the delinquent property, but routinely accepted the payments actually made. If a payment due in October was skipped, but a payment was made in November, the amount paid in November would be credited to the month of October, the delinquency carried forward, and the account book marked "delinquent" in October. The first of these delinquencies occurred in September, 1973, and Pulaski routinely accepted payments after default through the remainder of 1973, all of 1974 and until Pulaski wrote the letter of February 7, 1975 declaring a default (a period of approximately 17 months). Significantly, Pulaski even then did not declare *the agreement* in default. Instead, Pulaski declared a default in the payments due under the deeds of trust, and an intention to take over management, etc. thereunder. So far as this record shows Pulaski has never declared a default under Paragraph 7 of the agreement of January 18, 1973. Pulaski's acts and conduct constituted a waiver of strict compliance with the requirement that owners make monthly payments in the sum of $510.

■ Turning to the five criteria commonly used for aid in determining the intention of the parties, *Rexite Casting Co. v. Midwest Mower Corp.*, supra, 267 S.W.2d l. c. 332, we conclude that the writing of January 18, 1973 was divisible and severable, not singular and entire.

■ Clearly the subject matter of the agreement (payments on six loans) is inherently divisible and the consideration was expressly apportioned. Six separate and distinct properties, owned by six separate owners holding six separate accounts with Pulaski, are involved. Significant is the uncontradicted, unimpeached answer given by witness Noble in answer to the court's question, "Did you feel you were making one agreement when you were making six separate agreements?" He answered, "We actually made one agreement, but it was probably six separate in our minds maybe because of the different ownerships of these properties." Appropriate is the state-

ment in *Bianchi Bros. v. Gendron,* 292 Mass. 438, 198 N.E. 767, 771 (1935); "A contract may be entire in the sense that there is but one agreement covering all the terms and yet it may be that the performance under the contract will be divided into different groups each set embracing performances which are the agreed exchange for each other, the result being that the contract is entire but divisible." A contract is entire " 'when by its terms, nature, and purposes it contemplates and intends that each and all of its parts, material provisions, and the consideration are common each to the other and interdependent. A divisible contract is one in its nature and purposes susceptible of division and apportionment, having two or more parts in respect to matters and things contemplated and embraced by it, not necessarily dependent upon each other.' 7 Am. & Eng. Encyc. of Law (2d Ed.) 95. 'The test chiefly relied upon in such cases is whether the parties have apportioned the consideration on the one side to the different covenants on the other. * * * If the consideration is apportioned, so that for each covenant there is a corresponding consideration, the contract is severable.' 3 Page on Contracts, § 1484." *Dick v. Riddle,* 139 Mo.App. 584, 123 S.W. 486, 487 (1909).

The agreement gave Pulaski the absolute discretion to allocate the money to the several accounts as it chose. Pulaski exercised that choice, and memorialized the choice in a contemporaneous memorandum to which Noble and Goldman agreed. Thereby the parties themselves apportioned the consideration to the different covenants.

While under the terms of the agreement the $510 monthly payment was an "obligation due at the same time to the same person" (an indication of entirety and singularity), Pulaski waived strict compliance with this requirement, as we have seen. By its practical construction of the contract Pulaski treated the obligation as one payable monthly in whatever amount Eagle Realty collected and remitted on each separate account. From the practical construction of the parties it is manifest that the agreement was not "to take the whole or

none"; that while at the outset and under the agreement as originally drawn the parties contemplated faithful performance of the promise to pay $510 each month, they did not contemplate that there would be no bargain at all if there was an occasional lapse or omission in owners' performance of their promise to pay $510 each month. Another indication that the agreement was not one to take the whole or none is the fact that Pulaski did not undertake to foreclose on all six properties, en masse, but selectively gave notice of foreclosure on only three of them. Pulaski considered and treated them as individual properties; not as a class.

For the foregoing reasons we further conclude that the parties did not assent to all the promises "as a single whole, so that there would be no bargain whatever if any promise or set of promises were stricken out."

The circuit court properly considered the Harris Street transaction as separate and distinct from the other five situations. Viewing it as such the court properly stopped the foreclosure, since there had not been a single failure to remit the $133 monthly payments agreed upon by the parties. There having been no delinquency in the Harris Street account there was no right under the agreement of January 18, 1973 to foreclose on that property. Instead, "owners" have the right, on behalf of the property owner, to make the agreed monthly payments of $133 until the principal balance due is fully paid, in which event and at which time Pulaski will be obligated to waive all interest payments and cancel the lien.

Judgment affirmed.

SMITH, C. J., and ALDEN A. STOCKARD, Special Judge, concur.