[No. 1446-1.     Division One—Panel 2.     May 7, 1973.]

JOSEPH LYNCH, *Appellant,* v. WARREN M. HIGLEY *et al.,*
*Respondents and Cross-appellants.*

WILLIAMS, J., concurs in the result only.

*Ryan, Bush, Swanson & Hendel, Douglas R. Hendel,* and *David H. Oswald,* for appellant.

*Keller, Rohrback, Waldo, Moren & Hiscock, Pinckney M. Rohrback, McMullen, Brooke, Knapp & Grenier, E. H. Knapp, Jr.,* and *Steven H. Chestnut,* for respondents and cross-appellants.

HOROWITZ, J.—This appeal and cross-appeal concern obligations created by a series of four agreements. The principal question on appeal is whether the first agreement is superseded or merely modified by the fourth agreement, both of which are shareholder agreements. The principal question on the cross-appeal is whether the second and third agreements, each signed by the same parties as part of the same transaction, are so far interdependent that breach by a party of one of the agreements discharges the other parties from their obligations to perform the provisions of the other agreement.

The facts as the court found or could have found them are these. West & Wheeler Associates, Inc., is a closely-held Washington corporation engaged in residential and industrial real estate business. Warren M. Higley and Donald R. Ripley were two of its important shareholders and corporate employees in 1961 and since. On June 20, 1961, its shareholders, including Higley and Ripley, agreed in writing that:

> In the event any of the parties hereto shall leave the employ of the corporation by reason of death, or otherwise, the corporation shall have the option for a period of thirty days to purchase all of the stock of the retiring party.

The agreement contained a formula for computing the purchase price and fixed the amount and time for payment of purchase price installments following exercise of the purchase option. The agreement further provided that if the corporation did not exercise its purchase option, the leaving party or his personal representative should give written notice to the remaining shareholders of the leaving stock-

holder's retirement or death, as the case might be, and of the fact that 30 days

> has elapsed without the corporation exercising the option to purchase the stock, and each other stockholder is hereby granted an option, for a period of thirty days from the receipt of such notice, to purchase the stock of the retiring party upon the same terms and conditions of option and payment hereinbefore granted to the corporation.

The agreement provided still further that if neither the corporation nor the shareholders exercised their respective purchase options, the shares of stock were to be free of transfer restrictions.

Thereafter, with one inadvertent exception, each shareholder's certificate was prominently endorsed with the legend that it was "subject to the conditions of the stockholders' agreement dated June 20, 1961."

On October 3, 1968, Messrs. Lynch, Higley, and Ripley and West & Wheeler Associates, Inc., entered into a second and third written agreement as part of one transaction in an overall plan. The second agreement in part required that Messrs. Higley and Ripley, respectively, sell to Lynch, over a period of time, the former's stock interest in West & Wheeler Associates, Inc. The third agreement in part provided for the employment of Lynch, fixed the amount of his salary, and set up a formula for computing the bonuses to be paid to him. The second and third agreements are described in finding No. 2 later quoted.

On December 30, 1968, the corporation issued a stock certificate for 315 of its shares to Joseph W. Lynch, and on January 2, 1969, it issued a similar certificate for 1,000 of its shares to Joseph W. Lynch. Each certificate contained a legend prominently displayed thereon stating that the certificate was subject to the 1961 shareholder agreement.[1] In

---

[1] Laws of 1939, ch. 100, § 15, p. 292 imposed the obligation of placing a legend upon stock certificates concerning stock transfer restrictions entered into by stockholders. Effective June 30, 1967, RCW 62A.8-204 eliminated the necessity for such restrictions to be placed on stock certificates if the restrictions resulted from private agreements between

connection with the January 2, 1969 certificate, the corporation secretary furnished Lynch with a copy of the 1961 shareholder agreement. The latter kept it for several weeks and then returned it.

On February 11, 1969, after prior discussions among the shareholders, including Lynch, Higley and Ripley, a fourth agreement was entered into among the shareholders. The events leading up to the execution of the fourth agreement are described in finding No. 11 referred to later.

Subsequently, Lynch committed serious breaches of his October 3, 1968 agreements. The breaches are described in findings No. 3 to No. 8, largely not the subject of exception. As a result of the breaches, the board of directors of West & Wheeler Associates, Inc., on August 4, 1970, discharged Lynch. The court found:

> That the Board's discharge of Lynch was an exercise of honest business judgment, and constituted a good faith exercise of corporate powers in what the Board conceived to be the best interests of the corporation. That on the same day, after his discharge, Lynch submitted his written resignation as officer and designated broker of the corporation and said resignation was timely accepted in writing by the corporation.

Lynch, following his discharge and resignation, refused to sell to the corporation or its shareholders his shares in West & Wheeler Associates, Inc., acquired or to be acquired under the October 3, 1968 agreements. He took the position that he was under no obligation to do so.

On September 10, 1970, he sued the corporation and various shareholders, including Higley, for substantial damages claiming breach of contract, conspiracy, mismanagement, and defamation. On January 15, 1971, he also sued for specific performance of the 1968 stock selling agreement, naming as defendants Higley and the corporation.

stockholders. See In re Consolidated Factors Corp., 46 F.2d 561 (S.D.N.Y. 1931). Under RCW 62A.8-204, if the restrictions were imposed by the issuer (corporation), they would be ineffective "unless noted conspicuously on the security" except "against a person with actual knowledge of it."

Defendants, in their amended answer, alleged in paragraph 3:

>  'Defendants are ready, able and willing to purchase the stock of the defendant corporation standing in plaintiff's name at a price of $29.17 per share, or such price as is required by the purchase price formula of the agreements of February 11, 1969, and July [sic] 20, 1961, and to make the payment therefor required by the terms of the agreements of February 11, 1969, and June 20, 1961. That plaintiff refuses to sell the stock to defendants as required by the terms of the said agreements.

Following pretrial proceedings, including the entry of a summary judgment dismissing the defamation claim and other action taken by Lynch, the issues left for trial dealt with (1) Lynch's claim for damages for breach of his 1968 employment agreement, (2) Lynch's right to specific performance for the sale of stock under the second agreement, and (3) the right of shareholders Higley, Moum and Kelly to exercise the option given to the shareholders in the 1961 agreement, as modified by the 1969 agreement, to acquire Lynch's West & Wheeler Associates, Inc. shares. The trial court dismissed Lynch's claim for damages for breach of his employment contract. It is no longer an issue on appeal. The court granted Lynch's claim for specific performance of the second agreement but, recognizing the continued existence of the 1961 purchase option, granted shareholders Higley, Moum and Kelly the right to purchase back from Lynch his shares of West & Wheeler Associates, Inc. stock theretofore and thereafter to be acquired under the provisions of the second agreement. Lynch appeals insofar as the decree grants the shareholders the right to purchase his shares of stock acquired and to be acquired. Defendants Higley, Moum and Kelly, and West & Wheeler Associates, Inc., cross-appeal insofar as the decree awards Lynch specific performance of the second agreement.

Lynch's basic contention on appeal is that the February 11, 1969 agreement entirely superseded the June 20, 1961 agreement so as to eliminate the shareholders' option therefrom to purchase his shares of stock in West & Wheeler

Associates, Inc. after he left that corporation. He accordingly excepts to findings and conclusions adverse to his contention, claiming they rest upon evidence admitted in violation of the parol evidence rule. There is no claim that with respect to the critical findings, such as finding No. 11 later referred to, that the evidence, if properly admitted, is insufficient to support the findings made. We are satisfied that the evidence on which the critical findings were made was properly admitted and affirm the decree below.

A brief statement of the applicable legal principles upholding the admissibility of the challenged testimony is appropriate. It is settled that a fully integrated agreement of a contractual nature may not be varied by extrinsic evidence, written or oral, so as to add to, subtract from, or contradict its provisions. *Truck-Trailer Equip. Co. v. S. Birch & Sons Constr. Co.,* 38 Wn.2d 583, 231 P.2d 304 (1951). *See generally* Restatement of Contracts §§ 228-29, 237-40, 242 (1932); 5 R. Meisenholder, Wash. Prac., *Evidence* § 121 (1965). Whether an agreement of a contractual nature is one fully integrated has been much considered. One line of cases, said to apply a "mechanical test," holds that if a contract appears or purports to be complete on its face, parol evidence is inadmissible to add to, vary or contradict the agreement. Other cases, said to apply the "intent test," hold that parol evidence is admissible to show whether the contract is in fact a fully integrated or partially integrated agreement, or to show in fact whether the agreement, purporting to be fully integrated, nevertheless was actually executed as part of a transaction of which a collateral agreement, oral or written, was also intended to be a part. The first line of cases is illustrated by cases such as *Minder v. Rowley,* 35 Wn.2d 92, 211 P.2d 170 (1949), and *Webb McDonald Tractor & Equip. Co. v. Coyle,* 188 Wash. 658, 63 P.2d 475 (1936). The second line of cases finds recent illustration in *Black v. Evergreen Land Developers, Inc.,* 75 Wn.2d 241, 450 P.2d 470 (1969), and *Dix Steel Co. v. Miles Constr., Inc.,* 74 Wn.2d 114, 443 P.2d 532 (1968).

*See also Diel v. Beekman,* 1 Wn. App. 874, 465 P.2d 212 (1970).

The intent test has the considerable support of 3 A. Corbin, *Contracts* § 573 (1950). 5 R. Meisenholder, Wash. Prac., *Evidence* § 121 n.10 (1965), quotes with approval the following statement from 3 A. Corbin, *Contracts* § 573 (1950):

> As one eminent authority has stated,
>
> "The use of such a name for this rule has had unfortunate consequences, principally by distracting the attention from the real issues that are involved. These issues may be any one or more of the following: (1) Have the parties made a contract? (2)Is that contract void or voidable because of illegality, fraud, mistake, or any other reason? (3) Did the parties assent to a particular writing as the complete and accurate 'integration' of that contract?
>
> "In determining these issues, or any one of them, there is no 'parol evidence rule' to be applied. On these issues, no relevant evidence, whether parol or otherwise, is excluded. No written document is sufficient, standing alone, to determine any one of them, however long and detailed it may be, however formal, and however many may be the seals and signatures and assertions. No one of these issues can be determined by mere inspection of the written document."

Consistent with the intent test, admissibility of parol evidence under the partial integration and collateral contract exceptions does not violate the parol evidence rule. *See generally* 30 Am. Jur. 2d *Evidence* §§ 1043-44, 1049 (1967). As stated in *Buyken v. Ertner,* 33 Wn.2d 334; 205 P.2d 628 (1949), in dealing with the admissibility of parol evidence within two exceptions:

> One is comprehended in the doctrine of "partial integration," and the other in the doctrine of "collateral contract." While there is some distinction between these two doctrines, there is nevertheless a considerable similarity between them, both in their general application and also in the limitations governing them.

33 Wn.2d at 343. Quoting 32 C.J.S. *Evidence* § 1013, at 1028:

> "Where a written instrument, executed pursuant to a prior verbal agreement or negotiation, does not express

the entire agreement or understanding of the parties, the parol evidence rule does not prevent the introduction of extrinsic evidence with reference to matters not provided for in the writing."

33 Wn.2d at 344. In *Diel v. Beekman, supra*, the court said:

[T]he legal basis for the parol evidence rule is the theory of integration. A writing *intended* to supersede earlier and contemporaneous expressions is given that effect. This does not mean, however, that simply because there is a written agreement, other evidence will not be considered as a preliminary matter. . . .

. . .

Thus, before the parol evidence rule can be applied, the court must hear all extrinsic evidence and determine if the parties *intended* that the written agreement be the complete integration.

1 Wn. App. at 879-80.

In *Moran Bros. Co. v. Pacific Coast Cas. Co.*, 48 Wash. 592, 94 P. 106 (1908), the collateral contract exception was considered. The court said:

The rule that the terms of a written instrument cannot be varied by parol testimony cannot be gainsaid, and it is well established that all prior contracts are merged in the written agreement, and that such agreement is a final repository and evidence of the mutual obligation. But it is just as well established that parol testimony is admissible . . . to prove agreements between the parties which were not merged in the contract though they might have relation to the same subject-matter. It is the province of the court to determine, both from the written contract and from oral testimony, the intent of the parties in relation to what was incorporated in the written agreement.

48 Wash. at 597-98.

Even as to a fully integrated agreement, the parol evidence rule does not forbid the introduction of evidence to clear up an ambiguity contained therein. *Corinthian Corp. v. White & Bollard, Inc.*, 74 Wn.2d 50, 442 P.2d 950 (1968); *Brower Co. v. Baker & Ford Co.*, 71 Wn.2d 860, 431 P.2d 595 (1967); *Ladum v. Utility Cartage, Inc.*, 68 Wn.2d 109, 411 P.2d 868 (1966). *See generally* 30 Am. Jur. 2d *Evidence*

§§ 1069-78 (1967). The ambiguity may be explained by extrinsic evidence of facts and circumstances surrounding the transaction. *Ramsey v. Sedlar,* 75 Wn.2d 901, 454 P.2d 416 (1969); *Schauerman v. Haag,* 68 Wn.2d 868, 416 P.2d 88 (1966); *Dickson v. Hausman,* 68 Wn.2d 368, 413 P.2d 378 (1966). It is only if the contract is unambiguous that evidence of surrounding facts and circumstances cannot be used to add to, subtract from, or contradict a fully integrated agreement.

Furthermore, the parol evidence rule does not forbid parol evidence of the writings or matters referred to in the written contract which "may be regarded as incorporated by the reference as a part of the contract and therefore, may properly be considered in the construction of the contract." 17 Am. Jur. 2d *Contracts* § 263, at 666 (1964). *See generally* 1 S. Williston, *Contracts* § 47 (3d ed. 1957); 17 Am. Jur. 2d *Contracts* § 77 (1964).

We now consider the third question posed by Corbin: "Did the parties assent to a particular writing as the complete and accurate 'integration' of that contract?" Lynch contends that the parties did so in the 1969 agreement. Higley and those aligned with him contend they did not. Lynch relies upon the rule stated in 6 A. Corbin, *Contracts* § 1293, at 198 (1962), as follows:

[W]hen a second contract deals with the same subject matter as did the first contract made by the same parties, but does not state whether or to what extent it is intended to operate in discharge or substitution  .  .  . [t]he two contracts must be interpreted together. In so far as they are inconsistent, the later one prevails; the remainder of the first contract, being quite consistent with the second in substance and in purpose may be enforced.

Preliminarily, he relies on the "mechanical" parol evidence rule and contends the 1969 agreement on its face purported to be a completely integrated contract, so that evidence of the 1961 agreement was not admissible. Under the intent test, one followed here, parol evidence is admissible to show that the 1969 agreement was not a completely

integrated agreement; that it was one entered into as a modification of the 1961 agreement. To the extent consistent with the 1969 agreement, the 1961 agreement is still operative.

There is, however, a further legal basis for the admission of the 1961 agreement (as well as the 1968 agreements) under the rule that writings or matters referred to in a written contract may be treated as incorporated by reference and properly considered in the construction of a contract. The reference in the 1969 agreement to the obligation of West & Wheeler Associates, Inc. to "purchase all of the stock of the retiring party" requires that the "stock" or subject matter be identified. The stock certificates, including those dated December 30, 1968, for 315 shares, and January 2, 1969, for 1,000 shares, contain a prominently-displayed legend thereon reading "Transfer of this stock is subject to the conditions of the stockholders agreement dated June 20, 1961." The shareholders' agreement of June 20, 1961 could properly be admitted in evidence to make the legend on the certificate intelligible. Once in evidence, it became necessary to determine the legal effect of the 1961 agreement, i.e., whether that agreement was still operative. The 1961 and 1969 agreements included two differences: (1) The 1969 agreement substituted a requirement on the part of West & Wheeler Associates, Inc. to purchase the stock of a leaving stockholder, whereas the 1961 agreement merely gave the corporation an option so to do. (2) The 1969 agreement makes no reference to the option given to the shareholders in the 1961 agreement to purchase the shares of stock if the corporation did not.

The 1969 agreement also expressly states:

The provisions of separate stock agreement dated October 3, 1968, are not affected by this new agreement.

By this reference, the October 3, 1968 agreement became admissible in evidence. Lynch contends that the effect of the 1968 agreement was to remove from the operation of the then outstanding 1961 agreement the stock which he

was acquiring under the second agreement executed in 1968.

Lynch's contentions, in light of the agreements admitted, raised substantial questions concerning the true intention of the parties concerning the meaning of the 1969 agreement. The 1968 agreements made no reference to the 1961 agreement so as to justify Lynch's claim that the stock to be acquired under the second agreement was to be excepted from the operation of the 1961 agreement. Furthermore, the 1969 agreement and the 1961 agreement were not necessarily and totally inconsistent. These uncertainties justified the admission of parol testimony to explain the true intention of the parties. The evidence introduced removed those uncertainties. The evidence is summarized in finding No. 11, which reads as follows:

That in January, 1969, at the annual stockholders meeting of the corporation with all parties to this cause in attendance, Higley brought up for discussion a feature which he felt should be added to the "buy-sell" scheme established by the 1961 agreement. That Higley's concern was that when a minority shareholder-employee left the corporation there was no duty upon the corporation or the shareholders to exercise the options granted to them under the 1961 agreement, with the result that such a leaving shareholder might be unable to sell his stockholdings. That Higley proposed that a new feature be added to the "buy-sell" scheme adding a duty in the corporation to exercise the option granted to it under the 1961 agreement. That this proposal was agreed to by the shareholders at said annual shareholders meeting and that they instructed Moum to draft a shareholders' agreement establishing this duty in the corporation. That Moum, being untrained and inexperienced in the law, and being aware that the 1961 agreement was drafted by an attorney, resorted to the format of the 1961 agreement as an appropriate model for the format of the agreement he was instructed to draft, and accordingly so drafted the 1969 shareholders' agreement, which agreement was then signed by all shareholders including Lynch in February, 1969. That thereafter all stock certificates issued by the corporation continued to contain a prominent and legible

notation adverting to the restriction on stock ownership embodied in the 1961 shareholders' agreement.

From the instruments themselves and from the parol testimony, two facts emerge: (1) The desire of the parties to provide a market for the stock of a minority stockholder-employee when he left the corporation, and (2) the desire on the part of the remaining stockholders to protect themselves against the sale of his stock by a leaving stockholder to one who might be unfriendly or unsatisfactory to the remaining stockholders. Even Lynch, under his 1968 agreements, would own but 46.7 percent of the corporation stock and remain a minority stockholder-employee until December 30, 1972, when he would purchase the remaining 1,306 shares necessary to reduce Higley's holdings to 20 percent of the total shares outstanding. These facts have an important bearing on the meaning of the 1969 agreement. If the corporation was legally unable to purchase the stock of a minority stockholder because of the insufficiency of its earned or capital surplus (see RCW 23A.08.030), or if the corporation, whether or not it was legally able to purchase, had an unfavorable working capital position that would make it economically inadvisable for the corporation to purchase the stock, it would improve the marketability of the stock of a leaving stockholder-employee if the remaining shareholders had an option to purchase that stock on the same terms and conditions as did the corporation. Furthermore, the retention of the shareholders' option to purchase would better enable the remaining stockholders to protect themselves against the possibility of a leaving shareholder's stock getting into unfriendly or unfavorable hands. Considered then in light of the benefits both to Lynch and the remaining stockholders that would be enjoyed if the shareholder options were retained, and coupled with the parol evidence that the parties actually intended such a result, the court had a right to find, as it did, that the 1969 agreement merely modified the 1961 agreement and retained for the stockholders the option to purchase Lynch's stock at the updated price formula provided in the

1969 agreement. There being no error in the findings, the court rightfully concluded that shareholders Higley, Moum and Kelly retained the option to purchase Lynch's shares acquired and to be acquired, after Lynch left the corporation. The options continue to be exercisable.

In their cross-appeal, shareholders Higley, Moum and Kelly contend that the court erred in granting Lynch specific performance of the second agreement which gave to Lynch the right to purchase the stock of defendants Ripley and Higley. The trial court held that the second and third agreements, both of which were executed on October 3, 1968, created separate and independent obligations so that the breach by Lynch of the third agreement concerning his employment, salary and bonuses would not excuse Higley from performing his stock-selling obligations to Lynch contained in the second agreement. We hold that the obligations of the second and third agreements were entered into as part of one transaction, are to be construed together, that so construed they create dependent obligations, and that Lynch's breach of his employment obligations discharged Higley of his otherwise existing duty under the second agreement to sell his remaining shares of stock to Lynch.

The 1968 second and third agreements are correctly described in finding No. 2 as follows:

That the essential terms of the agreement were set out in a writing executed on October 3, 1968, consisting of 11 pages consecutively numbered from 1 through 11 and bearing, at the top of Page 1, the overall title of SALES AGREEMENT and ESCROW INSTRUCTIONS, SALARY AGREEMENT. That the agreement was divided into 2 major subdivisions: Page 1 through 9 established the scheme for Lynch's acquisition of majority shareholder status by providing for his purchase of corporate stock from Defendant Higley and Ripley over a period of four years; Pages 10 and 11 set out the terms of Lynch's corporate employment for that same period. That each of these sub-divisions were separately signed by all parties to the agreement. That the parties contemplated the agreement as embodying an overall plan for Lynch's entrance into

the corporation as Executive Vice President and Director of Sales, and majority shareholder. That it was contemplated that Lynch's employment duties would consist of management of the real estate division of the firm, evaluation of personnel, recruiting of new personnel, and supervision of the sales force.

The two 1968 contracts, signed by the same parties, were executed as part of one transaction. The first of the two 1968 agreements (agreement 2) is headed "Sales Agreement and Escrow Instructions, Salary Agreement." The first agreement contains no provisions relating to salary. The salary agreement is that contained in what is designated as the "Supplemental Agreement" (agreement 3). The supplemental agreement recites that it is executed "As part of the foregoing over-all plan . . ." On their face they appear to have been a single contract divided into two instruments. They are so treated in finding No. 2, to which no exception was taken.

The contents of the two agreements executed as part of one transaction on October 3, 1968 show the dependent character of the obligations described in each. The first agreement spells out Lynch's stock purchase obligations; the second agreement spells out Lynch's employment obligations, salary and bonus rights. The face of the two agreements appears to show that Lynch was relying upon his salary and bonus, provided for in the third agreement, to meet his stock purchase installment obligations under the second agreement. Thus, the corporation is required to provide financial assistance to Lynch in paying the purchase price. The corporation must lend Lynch $6,500 on January 2, 1969, and a like sum on January 2, 1970 "with which to make a portion of the payments to Ripley as above required." Lynch is required to repay the advances at the rate of $1,300 every 6 months until full payment, beginning July 1, 1969.

The first agreement spells out the number of shares to be sold and transferred over a period of years, the purchase price to be paid, and the purchase price formula to be used.

Thus, paragraph 2 obligates Lynch to purchase 485 shares from Ripley at $20 per share, the book value on December 30, 1967,

> plus an amount equal to the increase in book value of 1968 over 1967 and the actual appreciation for each year after 1968 to be added cumulatively, plus an additional sum per share equal to 25% of the excess of the appreciation over the amount of appreciation of 1968 over 1967.

There are similar provisions for valuing certain of Higley's stock in paragraphs 5 and 6. Paragraph 7 provides for the sale on January 2, 1979 of 20 percent of the stock remaining to West & Wheeler Associates, Inc. based on the "book value per share as shown upon the books of West & Wheeler Associates, Inc. on January 2, 1979." There is a further provision permitting Higley to accelerate the obligatory purchase by the corporation of the stock to be purchased pursuant to paragraph 7. Paragraph 8 of the agreement contains certain remedies available to Higley and Ripley should Lynch default in performing his purchase and payment obligations. Paragraph 9 confers upon Lynch voting rights from December 30, 1970 to January 2, 1973, to permit him representation on the board of directors of the corporation. There is a further provision to protect the interests of Higley and Lynch which prohibits the corporation from declaring any stock dividends, stock splits, or to issue or sell new shares, or sell any treasury stock of the company without the prior written approval of Messrs. Higley and Lynch. An internal examination of the provisions shows an intention to protect the seller's ability to have the funds with which to pay for the installment stock sales over a period of years and to protect the selling shareholders in obtaining payment at as high a price as the formula for the purchase price permits. The sellers evidently were willing to sell their stock on an installment plan over a period of years. Payment and price were dependent upon the prosperity of the corporation, which in turn was substantially dependent on Lynch's management skills.

■ During the period of time when installment sales were to be made to Lynch, Lynch was given the wherewithal to meet his purchase price obligations. The supplemental agreement (agreement 3) provided for a payment to Lynch of a salary plus a bonus based on 25 percent or more of the net profits of the year involved as the board of directors of the corporation might determine. For this salary and bonus, Lynch was employed to "devote his full time to management and well-being of the company . . ."

Under such a contract, Lynch had an implied obligation to properly perform his work, to stay with the corporation while living, during the life of the contract, and to perform his duties in such a way that he would not give cause for discharge. *See generally* 53 Am. Jur. 2d *Master and Servant* §§ 51, 97, 108, 109 (1970); 56 C.J.S. *Master and Servant* §§ 62, 63, 67, 69 (1948); 9 S. Williston, *Contracts* §§ 1012B, 1012C, 1014C (1967). When, therefore, Lynch so conducted himself that he was properly discharged for cause, he automatically deprived the selling shareholders of the protections given them by the 1968 contract to the extent executory, including the right to sell their stock to Lynch at a price to reflect the proper discharge of his duties.

■ ■ The two 1968 agreements executed as part of one transaction called for dependent obligations. Any other view would have made it possible for Lynch to deliberately breach his contract (as he later did) and thereby imperil the rights of the selling shareholders to receive the purchase price payments required at a price Lynch's successful operation would have made possible. Unless his stock was purchased, Lynch, although not working for the corporation, could acquire ultimate control of the corporation, discharge the stockholder-employees that he did not like, and thereby deprive the selling shareholders of the maximum benefits of the contract to which they were entitled. Under these circumstances, it is more reasonable to construe the obligations of the contract as being dependent rather than independent. The fact, if it be a fact, that after his rightful

discharge, Lynch is presently prepared to pay for the stock on an installment basis, does not change the dependent nature of the two 1968 contracts actually entered into.

When instruments are executed as part of one transaction, they should be considered together to ascertain the intent of the parties and the obligations actually and necessarily implied. *American Sheet Metal Works, Inc. v. Haynes,* 67 Wn.2d 153, 407 P.2d 429 (1965); *Levinson v. Linderman,* 51 Wn.2d 855, 322 P.2d 863 (1958); *Paine-Gallucci, Inc. v. Anderson,* 41 Wn.2d 46, 50, 246 P.2d 1095 (1952); 17 Am. Jur. 2d *Contracts* § 264 (1964). Furthermore, the material failure of performance by one party not justified by the conduct of the other discharges the latter's duty to give the agreed exchange. *Jacks v. Blazer,* 39 Wn.2d 277, 235 P.2d 187 (1951); Restatement of Contracts §§ 274, 397 (1932). It is true that the contract does not purport to expressly spell out the rules of dependent obligations discussed. However, as stated in L. Simpson, *Contracts* § 102, at 213-14 (2d ed. 1965):

> Certain terms, though unexpressed, are imported into the contract by law without proof that they were intended by the parties. Unless a contrary intention was expressed, the law conclusively presumes that they intended to make them a part of their contract. "The unexpressed obligations in these instances, which are implied by law, are those which are inherent in the transaction according to its true nature, and may be regarded as the unexpressed intention of the parties. . . ."

*See also* Restatement of Contracts §§ 266, comment *b,* 267, 268, 272 (1932).

The errors assigned on cross-appeal fall into two categories. The first two deal with portions of findings of fact No. 14 and 15. The remaining assignments of error deal with conclusions of law proceeding on the premise that the 1968 agreements are two separate, independent contracts the breach of one having no effect upon the other. For the reasons stated, we believe these conclusions to be erroneous. Findings No. 14 and 15 likewise assume that the supplemental agreement—the employment contract—cre-

ates obligations separate and independent from the sales agreement. The findings also set forth the amounts payable by way of sales price. Holding, as we do, that sale need not be made because the duty to sell was discharged by Lynch's breach of contract, the correct amount of the purchase price otherwise payable is no longer material.

The judgment on the appeal is affirmed and the judgment on the cross-appeal is reversed with directions to dismiss Lynch's suit for specific performance.

CALLOW, J., concurs.

WILLIAMS, J., concurs in the result.