**B & B EQUIPMENT CO., INC., a Missouri Corporation, Plaintiff-Respondent,**

v.

**John A. BOWEN, Defendant-Appellant.**

**No. KCD29622.**

Missouri Court of Appeals, Western District.

April 30, 1979.

David V. Bear, Columbia, for defendant-appellant.

Channing D. Blaeuer, Cynthia A. Suter, Moberly, for plaintiff-respondent.

Before SHANGLER, P. J., and WASSERSTROM and CLARK, JJ.

WASSERSTROM, Judge.

B & B Equipment Company, Inc. filed this suit to obtain a judgment declaring its right to terminate a contract under which defendant John A. Bowen was entitled to purchase 100 shares of the corporate stock. Bowen counterclaimed for a declaration that the contract is valid and subsisting and that he has a continuing right to purchase the 100 shares. The trial court rendered declaratory judgment as prayed by B & B, and Bowen appeals.

B & B is the successor to Braymen Tractor Company which was originally owned by Mr. and Mrs. L. D. Braymen. The Braymens took Robert J. Jaecques and William L. Hughes into the business in 1964, first as employees and then later as partners and finally as equal stockholders in a corporate form of doing business.

In 1968, L. D. Braymen wanted to retire and Jaecques and Hughes desired to find someone to take Braymen's place. At that particular time, Bowen who had had prior experience in the same line of business, was unemployed and available. Accordingly, on December 28, 1968, the parties entered into an oral agreement with Bowen under which Bowen would become an equal participant in the business in place of Braymen. Bowen, however, did not have sufficient funds to pay the value of Braymens' 100 shares of stock, which was agreed to be $15,000. The corporation therefore agreed to buy the stock from the Braymens for $15,000 and in turn to sell that stock to Bowen for the same sum. Bowen was to and did pay $2,500 direct to the Braymens. B & B gave the Braymens its note for $12,500, payable with interest of 6% per annum. Bowen was to be entitled to all dividends on the 100 shares, and he agreed to pay back the dividends to B & B for application on the purchase price of the stock. When those payments for the stock totaled $12,500, plus whatever interest B & B had by then incurred to the Braymens, B & B was to deliver the 100 shares to Bowen. Under the agreement, Bowen was to assume as his primary responsibility all the corporate record keeping and bookkeeping, and he was in addition to devote his full time and attention to the corporate business in whatever capacity became necessary, including selling. The salaries of all three men were to be equal.

Promptly after the making of that agreement, Bowen did assume his new duties and at the beginning performed in a manner satisfactory to Jaecques and Hughes. Dividends were declared from 1969 to 1976 of which Bowen's share came to $7,156 and which were paid to him. He, in turn, repaid an equivalent amount on each occasion to be applied toward the stock purchase. However, starting in about 1972, Bowen began engaging in outside business activities and spent less time on his duties for B & B, with the result that Jaecques and Hughes became more and more dissatisfied with Bowen's performance. This dissatisfaction developed to the point that on April

27, 1976, a meeting was held between the three men in which Jaecques and Hughes informed Bowen that he was discharged. Approximately two or three weeks before that, B & B had paid a dividend for the year 1975, of which Bowen's share was $800, and at the time of the April 27 meeting Bowen had not yet repaid that sum to be credited on the stock purchase.

Following his discharge, Bowen retained counsel and on May 4 his lawyer wrote to the B & B attorney stating that Bowen would release any and all interest in the corporation for the sum of $82,350. On May 24, 1976, the corporation's attorney responded that B & B had elected to rescind the 1968 agreement and tendered to Bowen the sum of $9,656, representing the $2,500 paid by Bowen to the Braymens, together with the $7,156 dividends which Bowen had received from B & B and contributed toward payment of the stock. On June 2, 1976, Bowen's lawyer wrote rejecting the Corporation's tender and countered with a tender by Bowen of $5,344, plus whatever the amount of interest was that B & B had paid the Braymens, in exchange for which Bowen demanded the issuance to him of 100 shares of B & B stock.

The impasse thus created led to the present lawsuit. After hearing evidence without a jury, the trial court made findings of fact which included the following:

"6. That on or about April 27, 1976 Jaecques and Hughes fired defendant as an employee and officer in the business. This action resulted from dissatisfaction with defendant in not devoting his full time and best efforts to the interest of the business. That defendant over a period of time did not properly keep the books of the plaintiff's business and did not devote his full time to his responsibility in the business. That defendant, as of April 27, 1976, had not paid to plaintiff the $800.00 dividend to be applied on defendant's obligation to purchase stock. That such actions and omissions and failure to act and perform on part of the defendant constituted a breach of the terms and conditions of the contract between plaintiff and defendant.

\* \* \* \* \* \*

"9. The court finds defendant did breach the conditions of the contract of December 28, 1968 as set out in paragraph 6 herein and that plaintiff was entitled to rescind the contract upon payment to defendant of the sum of $9,656.00 representing the total of the benefits received by plaintiff from defendant under said contract."

I.

*Sufficiency of the Evidence*

Bowen's first point on appeal is that the trial court's determination is not supported by the evidence. Despite the phraseology of that point, the main thrust of Bowen's argument thereunder is that even if the evidence did support a finding that Bowen had breached the contract, nevertheless Bowen's default was not so serious as to warrant rescission. That contention really argues in slightly different form, the substance of what is presented in the argument advanced under Bowen's point 2 and that subject will be reserved for discussion under section II of this opinion. The discussion at this point will be confined to an inquiry as to whether Bowen did in fact breach the contract.

■ The disputed issues of fact in this regard are as follows: (A) whether Bowen's delay in repaying the $800 constituted a breach; (B) whether Bowen took business hours away from duties for the corporation in order to pursue outside business activities of his own; (C) whether Bowen performed his record keeping and bookkeeping in a satisfactory manner; (D) whether Bowen failed to lend sufficient help in sales activities, and (E) whether the other stockholders voiced their dissatisfaction to Bowen prior to the discharge, thus giving him adequate warning and opportunity to remedy the alleged defaults.

A. *The $800 Repayment.* Without dispute, B & B did pay Bowen a dividend of $800 about the middle of April, 1976, and Bowen had not tendered repayment of that

amount toward the stock purchase up to the time of his discharge on April 27, 1976, nor had he repaid the $800 up to May 24, 1976, when B & B declared a rescission. However, by his letter dated June 2, 1976, Bowen did tender the full balance still owed by him on the stock purchase, which, of course, covered the $800 which he had received in April. The question therefore becomes whether Bowen's delay from April to June constituted a breach of agreement.

To be noted in this respect is that the agreement between the parties did not call for repayment within any definite specified time. Bowen testified that in fact there had been a delay of two or three weeks in prior years between the date upon which the dividend was paid and the date when he made repayment of a like amount to be credited against the stock purchase. Under these circumstances, and considering the confused situation caused by Bowen's discharge on April 27, 1976, it cannot be said that Bowen delayed an unreasonable length of time in making his tender. See *Cochran v. Grebe*, Mo.App., 578 S.W.2d 351 (1979). The portion of the trial court's finding is therefore disapproved which holds that Bowen's delay in this regard constituted a breach of the agreement. That disapproval, however, does not change the result, because there was other conduct constituting breaches of the agreement, discussed below.

B. *Outside Business Activities.* Jaecques and Hughes both testified that during the last four years before the discharge, Bowen had devoted an increasing amount of time to personal business activities of his own. They testified that he was engaged in the selling of real estate and that the B & B business phones were often times tied up by Bowen conducting his real estate business. They further testified that Bowen was gone from the business premises much of the time, Jaecques estimating that these absences would run as much as 50% of the business hours. They also testified that Bowen spent some of his time at B & B using the company equipment to make ornamental rings. In addition to that, they testified that Bowen went to auctions of used farm equipment where he bought certain pieces of equipment which he then brought back to the B & B shop for reconditioning and that Bowen would then resell that equipment for his own account and profit.

Bowen did not wholly deny, but only tried to minimize, the foregoing testimony. He admitted that he had sold three farms and two houses during the years 1973 and 1974, and that he had made and received phone calls at the B & B offices in connection with his real estate activities. He denied that he had made any real estate sales after 1974, but his denial did not go so far as to say that he had not made attempts at sales in the subsequent period. He acknowledged that he had brought some personally owned equipment with him when he first came to work for B & B in December, 1968, which he thereafter sold for his own account, and he further acknowledged that he had attended auctions and purchased used equipment which he brought to B & B for reconditioning. However, with respect to the latter equipment, he testified that the purchases and resales were for the account of the corporation and B & B received the profit. Bowen also admitted that he sometimes took two to three hours for lunch, and he also admitted that he came back to the B & B office late at night after regular hours in order to do bookkeeping work.

The testimony by the opposing parties on this subject presents some conflict. That conflict was resolved by the finding of the trial court, to which this court must give deference under Rule 73.01–3(b). Accordingly, the finding of breach of contract by Bowen in this regard must be accepted.

C. *Sufficiency of Performance of Bookkeeping Duties.* Jaecques and Hughes testified that the corporate records were improperly kept in many important respects. According to them, the perpetual inventory was far off from the actual inventory so that items were shown on perpetual inventory which were not actually present and some of the actual inventory was not shown

on the records. Certain loans to the corporation were not reflected on the books of account. The bank balances were not reconciled. Bowen was so far behind in bookkeeping that he neglected to take advantage of available cash discounts, although the corporation had the money on hand with which those bills could have been paid. After Mrs. Braymen left the office, Bowen never did close the books at the end of the month and strike a monthly balance sheet as she had done and which was required by the B & B suppliers. For some period of time, Bowen had this month-end work done by his wife, but later (over the protest of Jaecques and Hughes) he hired a professional accountant, Fine, to do that phase of the company accounting, with Fine being paid at B & B expense. After Bowen was discharged, B & B hired Mrs. Braymen to return to do the office work and she found that no balance sheet had been prepared since October of 1975, that there were large inventory discrepancies, that the bank balances had not been reconciled, and she had trouble putting the records into order. Jaecques further testified that at one time when he and Hughes suspected laxness in the keeping of cash records, he made a test by abstracting sums of money from the cash drawer which he held out until the withdrawals accumulated to more than a hundred dollars, after which he returned the abstracted money to the cash drawer. Bowen did not report or comment upon money either being short or over.

Bowen for his part denied any basic improprieties in his performance of bookkeeping. However, he did admit that he had never closed the books or made up a monthly balance sheet, and he further admitted that he hired Fine at company expense to do this work until Fine's death and that thereafter he employed another outside accounting firm at company expense for that purpose.

Here again, the conflict in evidence has been resolved by the trial court and is entitled to deference under Rule 73. The finding in this respect is therefore approved.

D. *Sales Assistance.* Jaecques testified that Bowen never lent a hand at sales work even when obviously needed, until either he or Hughes would make direct request upon Bowen. Bowen never developed any clientele of his own, and his portion of the total sales would be only approximately 10%. Hughes corroborated that general testimony. Bowen on the other hand insisted that he did his "fair share" of sales work. The evaluation of this conflicting testimony was for the trial court, to which deference is due under Rule 73.

■ E. *Protests and Warnings.* Jaecques testified that he had discussed Bowen's shortcomings with him several times. Bowen, on the other hand, said that although there were some disagreements, there was "nothing serious" except with respect to his insistance upon hiring Fine to do part of the bookkeeping work. Bowen also testified that at one time he suggested that each of the three stockholder-employees use a time clock, which can well lead to the inference that Jaecques was protesting to Bowen about the latter's taking too much time away from his duties at B & B. In any event, to the extent that there is a conflict in evidence on this point, the facts must be taken in accordance with the result reached by the trial court. *Westinghouse Electric Co. v. Vann Realty Co.*, 568 S.W.2d 777 (Mo. banc 1978); *In re Marriage of Prenavo*, 556 S.W.2d 463 (Mo.App.1977); *De Paul Hospital v. Southwestern Bell Tel.*, 539 S.W.2d 542 (Mo.App.1976); *Collins v. Bowyer*, 524 S.W.2d 190 (Mo.App.1975).

## II.

### Materiality of Bowen's Breach

■ Bowen's second point on appeal is that his "breach did not go to the very substance of the contract and further, any breach was waived and the trial court should have estopped assertions otherwise." The legal doctrine upon which Bowen rests this argument is that a rescission of a contract for breach by the other party must relate to a vital provision going to the very substance or root of the agreement, and cannot relate simply to a subordinate or

incidental matter. *McCullough v. Newton,* 348 S.W.2d 138, 142 (Mo.1961). Bowen attempts to bring himself within that principle by arguing: "The contract respondent corporation and appellant entered into on December 28, 1968, was for the purchase of L. D. Braymen's One Hundred (100) shares of stock. * * * The further agreement of employment with the respondent corporation was incidental to the major purpose of the contract, that of purchasing the stock of L. D. Braymen."

The argument just quoted turns the real situation up side down. Rather than the principal purpose of the agreement being the sale and purchase of stock, clearly the major purpose of the transaction between B & B and Bowen was the performance of services by Bowen. The stock itself was to go to Bowen on terms which can be explained only on the basis that Jaecques and Hughes were willing to let him become a one-third owner in expectation of valuable services to be contributed by Bowen. Indeed, by far the major part of the purchase price was to come from the corporation itself in the nature of a bonus which could only be for services rendered.

■ B & B did not make this deal with Bowen in order to obtain needed capital. Instead the real purpose which stands out on this record as a whole is that Jaecques and Hughes wanted a "third partner" to take the place of the retiring partner Braymen. What they wanted were Bowen's services, not his money; and in fact the only money which Bowen was ever to put up out of his own pocket was the initial $2,500. The only realistic appraisal of this situation is that the services to be performed by Bowen were the "very substance and root of the contract" so that his failure to adequately perform those duties did constitute a material breach warranting rescission.

Bowen suggests that the definition of materiality should be amplified by utilization of the guidelines set forth in Restatement of Contracts, Section 275. Comment a to that section states that in determining whether a breach of contract is a material one, it is impossible to lay down a rule that can be applied with mathematical exactness and that such a determination depends upon considerations of inherent justice. Nevertheless, this section of the Restatement suggests certain guidelines, each of which will now be considered in connection with the facts of the present case:

A. The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated. Here, B & B (the injured party) received some performance from Bowen for a period slightly in excess of five years, but those services were defective for reasons already discussed under section I of this opinion. Jaecques and Hughes had agreed that Bowen could acquire a one-third ownership in their corporation on extremely favorable terms, in the expectation that they were obtaining an experienced partner who would devote his full time and attention to the company business. That expectation failed of fulfillment. It cannot reasonably be said that Jaecques and Hughes received the substantial benefit which they had a right to expect.

B. The extent to which the injured party may be adequately compensated in damages for lack of complete performance. Bowen suggests no way in which his breaches of contract may be measured in monetary terms. This situation does not lend itself to compensation in damages.

C. The extent to which the party failing to perform has already partly performed or made preparations for performance. Bowen here had partly performed, but defectively. Despite protests, he failed and neglected to make good the deficiencies. This guideline operates somewhat in Bowen's favor, but not decisively so.

D. The greater or less hardship on the party failing to perform in terminating the contract. The value of the 100 shares of B & B stock appreciated between December 1968 and April 1976. Bowen will receive the benefit of at least a substantial part of that increase by reason of the payment to him of the $7,156 in dividends declared by B & B during that period. To the extent that

Bowen does not receive the full benefit of the increase in value of the 100 shares, his wound is self-inflicted by his defaults in performance. In addition, whatever loss is suffered by Bowen is more than counterbalanced by the hardship and unfairness which would be caused to Jaecques and Hughes by an opposite ruling.

E. The willful, negligent or innocent behavior of the party failing to perform. As heretofore discussed, Jaecques made protest and gave fair warning to Bowen concerning the unacceptability of Bowen's performance. Bowen's continuance in his unacceptable performance was at the very least negligent.

F. The greater or less uncertainty that the party failing to perform will perform the remainder of the contract. This particular criterion is of doubtful application in this present situation. If it be applicable, Bowen has had over five years in which to demonstrate his good faith and willingness to carry his share of the burden. Jaecques and Hughes cannot with fairness be required to experiment even longer in some vague hope of improvement.

Bowen also argues that B & B should not be permitted to rescind because that would be a violation of good faith and fair dealing on its part, because it had waived any claim of defect in Bowen's performance, and because it should be estopped to assert any such defect. All this multifaceted argument rests on the assertion that B & B never protested to Bowen concerning the unacceptability of his performance of duty and that the corporation therefore caused him to rely upon a belief that his performance was satisfactory. That argument in all of its aspects falls because of the false factual premise. As heretofore discussed in section I of this opinion, Jaecques did protest to Bowen and gave him warnings. It cannot be fairly said that B & B failed in any duty of fair dealing or that it was waived or is estopped to assert its right of rescission.

## III.

### Divisibility

Bowen's third point is that the employment under the December 28, 1968 contract is divisible from the stock purchase, so that even though Bowen may have made a material breach of the employment part of the contract, that did not authorize a rescission of the stock purchase part.

The rule as to what constitutes an entire as compared to a severable contract can be stated in only general terms, subject to flexible application. It is said that there is no formula for a test in all cases, and each case must depend largely on its own circumstances. 17A C.J.S. Contracts § 331, p. 302. According to Williston on Contracts, 3d Ed., Section 863, p. 275: "The essential test to determine whether a number of promises constitute one contract or more than one is simple. It can be nothing else than the answer to an inquiry whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out." That statement of the rule by Williston is quoted with approval in *Swinney v. Continental Bldg. Co.*, 340 Mo. 611, 102 S.W.2d 111, 120 (banc 1937). To the same effect: *Katz v. Pulaski Savings and Loan Ass'n.*, 546 S.W.2d 24, 26 (Mo.App.1976); *Rexite Casting Co. v. Midwest Mower Corp.*, 267 S.W.2d 327 (Mo.App. 1954).

Applying the quoted test here, it can hardly be doubted that B & B would have refused to enter into the December 28, 1968 agreement had it not been for the employment feature. As has already been developed under section II of this opinion, the employment of Bowen was the dominant reason and motivating cause for the entire contract. It is inconceivable that Jaecques and Hughes would have agreed to let Bowen have one-third of all the stock for only $2,500 paid in were it not for their expectation that he would earn the additional $12,500 of the purchase price through the value of the services he would supply to the corporation over and above his stated salary.

The present case bears considerable analogy to *Lynch v. Higley*, 8 Wash.App. 903, 510 P.2d 663, 670 (1973), in which it was held that the breach of an employment contract by an employee-stockholder excused another stockholder from his contract obligation to sell the remainder of his stock to the defaulter.

■ We hold that the employment portion of the December 1968 contract is not severable from the stock purchase portion.

### IV.

#### *Adequacy of the Remedy*

Bowen argues that the remedy granted by the trial court is inequitable in that he should have been awarded specific performance of the stock purchase agreement. The short answer to that argument is that Bowen is disentitled to specific performance because of his own prior material breach. *Landau v. St. Louis Public Service Company*, 364 Mo. 1134, 273 S.W.2d 255 (banc 1954).

Bowen argues also that B & B should not have been granted relief because its conduct was inequitable. This argument is erected upon the contention that B & B had never protested to Bowen that his performance was unsatisfactory and that B & B thereby led him to believe that his performance was acceptable. This underlying factual contention is incorrect in light of the evidence already discussed.

■ However, although not specifically argued by Bowen, the relief granted by the trial court does seem plainly inadequate and inequitable in another respect; that is, the failure of the decree to give credit to Bowen for the income taxes paid by him which otherwise would have fallen upon B & B. This phase of the matter arises out of the fact that B & B and its stockholders had elected from the beginning to be taxed under Subchapter S of the Internal Revenue Code. Pursuant to this election, B & B was taxed essentially as a partnership, with all the corporate profits being taxed to the individual stockholders in proportion to their stockholding, and with the corporation itself being excused from the payment of income tax. This tax result followed regardless of how much of the corporate profit was actually distributed to each of the stockholders.

The record shows that B & B did have substantial corporate profits upon which the stockholders individually paid taxes, but that not all of those profits were actually distributed as dividends. Thus for example, the record shows that the individual stockholders each paid substantial tax on the corporate earnings in the years 1972 and 1973, although no dividends were paid by B & B in those years. The testimony was that B & B paid out as dividends only such cash earnings as could be spared, and that the balance of the profits was plowed back principally in the form of inventory.

So it is that Bowen has paid taxes on corporate earnings which he has never received and which he now can never receive. In effect he has paid taxes in lieu of and for the benefit of B & B. The only equitable course is to require B & B to reimburse Bowen for that amount of income tax paid by him.

The judgment is affirmed except as to the amount which is to be paid by B & B to Bowen. This case is remanded to the trial court for the purpose of determining the amount of income tax paid by Bowen attributable to the corporate earnings by B & B which were not distributed. That amount is to be added to the $9,656 paid by Bowen toward the 100 shares of capital stock, and the aggregate total of those two sums is to be paid to Bowen by B & B.

All concur.