[No. 3643–II.   Division Two.   February 24, 1981.]

BREM–ROCK, INC., *Respondent,* v. A. C. WARNACK,
ET AL, *Appellants,* MARTIN L. GOIT, ET AL,
*Respondents.*

*Pamela D. Larson, David L. Ashbaugh* and *Arthur D. McGarry,* for appellants.

*Gary H. Sexton,* for respondents.

PETRIE, J.—Defendants Warnack and McDonald, d/b/a Brem–Ready Mix (Ready Mix) appeal from that part of a judgment awarding plaintiff, Brem–Rock, Inc., the sum of $33,872.53 as a balance due it by the defendants pursuant to a requirements contract in which plaintiff agreed to "furnish all gravel and concrete sand" to defendants "for all jobs obtained" by them in Kitsap County. We reverse and remand for new trial.

Prior to commencement of this lawsuit, plaintiff's predecessor, Brem–Rock, a partnership owned and operated by Martin and Walter Goit,[1] was engaged in the Kitsap County area in the business of excavating and selling materials used for making concrete and for other building purposes. Defendants Warnack and McDonald operated Ready Mix, a partnership formed in 1976 for the purpose of mixing and selling ready–mix concrete. Warnack was the principal partner in Ready Mix and was also the principal owner of Santa Fe Construction, a large California contractor doing substantial business in Kitsap County on govern-

---

[1] Plaintiff corporation is the successor in interest of the former general partnership. The corporation continued to engage in the same business as its predecessor.

ment contracts.

In 1976 Ready Mix was looking for a steady source of gravel and concrete sand for use in processing ready–mix concrete. At approximately the same time Brem–Rock was in the process of obtaining a lease of a gravel pit from James Skirving. Ready Mix and Brem–Rock, both represented by attorneys, entered into negotiations, and on June 28, 1976 the parties signed a draft document which expressed a general understanding of their agreement. The draft agreement provided that Brem–Rock would satisfy Ready Mix's requirements for gravel and concrete sand at a price of $2.85 per ton for gravel and $2.75 per ton for concrete sand for 5 years. In addition, Ready Mix would supply equipment to Brem–Rock to allow the pit to become functional; Brem–Rock paid for this equipment through a 25–cent deduction on each ton sold to Ready Mix.[2] The draft agreement also provided that Brem–Rock would meet Ready Mix's requirements unless Ready Mix agreed otherwise in writing.

Although the agreement signed on June 28 was considered by the parties to be the basic agreement, the parties agreed to meet again to clarify certain points and to prepare a final draft. At this subsequent meeting, held on July 2, the parties agreed that Ready Mix's attorney would prepare the final draft. This draft, backdated to June 28, was delivered to Brem–Rock's attorney, who was out of town at the time. On July 16 the Goits signed the final draft in their attorney's office, although they had not read it and their attorney had not yet reviewed it.

The final draft contained a significant change from the earlier draft. Regarding sales by Brem–Rock to third parties, paragraph 5 of the final draft stated that Ready Mix had

the exclusive and sole option and right to purchase all

---

[2]The draft agreement also provided that Brem–Rock would set aside property at the pit site to enable Ready Mix to operate a "batch plant" for the actual preparation of the product.

materials extracted from [the gravel pit] and [Brem–Rock] shall not use nor sell or otherwise dispose of such materials without the written consent of [Ready Mix[3]].

Thus, while the earlier draft merely granted Ready Mix priority for its requirements over sales to third parties, the final draft gave Ready Mix the power to prevent entirely third party sales.

After the contract was signed, Ready Mix installed the equipment and began paying Brem–Rock the agreed price for its requirements, less the 25–cent deduction and a deduction for "moisture content."[4] Also, during the months of September, October, and November 1976 sales to third parties were made; Ready Mix, however, not Brem–Rock, made the sales and billed the third parties on behalf of Brem–Rock.

In December 1976, the procedure regarding sales to third parties was changed, with Brem–Rock doing the selling and billing. At the same time, however, Ready Mix, allegedly as consideration for its consent to third party sales, began taking an additional deduction on its purchases of $1.15 for each ton sold by Brem–Rock to third parties.[5] One of the basic fact disputes between these parties is whether Brem–Rock agreed to this deduction. In any event, Ready Mix did take the deductions, and in March 1977, plaintiff brought this action, alleging defendants were delinquent in payment

---

[3]According to Ready Mix, the purpose of this paragraph was to assure Ready Mix that the pit would not be depleted during the term of the contract.

[4]The "moisture content" deduction constituted approximately 3 to 8 percent of the contract price. Ready Mix contended at trial that such a deduction was customary in the Kitsap County area. Evidence educed at trial, however, indicated that such a deduction was not customary. Accordingly, the trial court awarded Brem–Rock judgment in the amount previously deducted by Ready Mix for that "moisture content." Ready Mix does not appeal that part of the judgment awarded to Brem–Rock for this moisture content deduction.

[5]The $1.15 figure was based on the difference between the market price of gravel ($4 per ton) and the contract price ($2.85 per ton). At least for several months in 1977 Brem–Rock's records of sales to third parties were made available to Ready Mix on a daily or periodic basis.

for sand and rock already delivered. Accordingly, Brem–Rock sought reimbursement in full, damages for breach of contract, and cancellation of the contract. Defendants denied the delinquencies and asserted as an affirmative defense that plaintiff "waived and/or is estopped by its conduct from asserting its claim." Further, as a counterclaim, defendants alleged that plaintiff breached the contract by selling material to other parties, and sought damages and an injunction enjoining plaintiffs from selling material to other parties. At the beginning of trial Brem–Rock moved to exclude any evidence of an "oral agreement" regarding the $1.15 deduction, contending the statute of frauds would render any such agreement unenforceable. The trial court initially reserved and subsequently granted the motion, holding that the statute of frauds prohibited any oral modification of the contract and the doctrine of part performance did not apply.

This appeal revolves around four rulings made by the trial court. During trial the court (1) held the final draft was a final integration of the parties' agreement and could not be varied by parol evidence; and (2) rejected under the statute of frauds Ready Mix's offer of proof that the $1.15 deduction was based on a subsequent oral agreement between Warnack and Martin Goit. At the conclusion of trial the court (3) refused to enforce paragraph 5 of the final draft, holding that any interpretation of the agreement prohibiting third party sales without Ready Mix's consent would be unconscionable; and (4) relied on the earlier draft of the agreement, despite its previous ruling that the final draft was a final integration, to find that the parties contemplated Brem–Rock would be permitted to make third party sales so long as it could also satisfy Ready Mix's needs.

The key issue of this appeal is the trial court's ruling that any interpretation of the agreement prohibiting third party sales without Ready Mix's consent would be unconscionable. The crux of this ruling is the trial court's finding that the agreement did not include any "corresponding duty on

the part of [Ready Mix] to buy any quantity of materials from [Brem–Rock]." The trial court concluded that the prohibition against third party sales without Ready Mix's consent, when combined with no duty to buy, gave Ready Mix "life and death power" over Brem–Rock. Ready Mix argues on appeal, however, that although the agreement contains no express promise by Ready Mix to buy, such a promise can be and is implicit in a requirements contract. We agree.

■ A requirements contract has been defined as one in which the buyer "expressly or *implicitly* promises that he will obtain his goods or services from [the seller] exclusively." (Italics ours.) *Bank of America Nat'l Trust & Savings Ass'n v. Smith*, 336 F.2d 528, 529 n.1 (9th Cir. 1964). Such a promise may be implied "when it is apparent that a binding contract was intended." *Propane Indus., Inc. v. General Motors Corp.*, 429 F. Supp. 214, 219 (W.D. Mo. 1977). *See also* Annot., *Mutuality and Enforceability of Contract To Furnish Another With His Needs, Wants, Desires, Requirements and the Like, of Certain Commodities*, 26 A.L.R.2d 1139 (1952).[6] Further, article 2 of the Uniform Commercial Code, which governs the agreement involved in this case, recognizes the validity of requirements contracts, merely imposing on the buyer a good faith obligation to purchase. RCW 62A.2–306(2).[7]

There can be no dispute that the parties in this case

---

[6]Several Washington cases have upheld a contract despite the lack of express mutual promises. *Geyen v. Time Oil Co.*, 46 Wn.2d 457, 282 P.2d 287 (1955); *Reeker v. Remour*, 40 Wn.2d 519, 244 P.2d 270 (1952). *See also* Cosway, *Sales–A Comparison of the Law in Washington and the Uniform Commercial Code*, 35 Wash. L. Rev. 412, 414 & n.16 (1960).

[7]RCW 62A.2–306(2) provides:
"A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale."

intended a binding agreement.[8] The agreement was entered into only after extensive negotiations between the parties, both of whom were represented by attorneys. The subsequent conduct of the parties in executing the terms of contract is further evidence that a binding agreement was intended. *See* RCW 62A.2–204(1). Also, it is clear that Ready Mix purchased its requirements under the contract exclusively from Brem–Rock. Though Brem–Rock alleges in its brief that Ready Mix purchased some materials from other sources, Martin Goit admitted that Ready Mix only purchased from other sources materials that Brem–Rock did not sell. Consequently, Ready Mix was contractually obligated to purchase its requirements from Brem–Rock.

Given this contractual obligation, it necessarily follows that the trial court's characterization of the agreement as giving Ready Mix "life or death power" over Brem–Rock was erroneous. Undoubtedly, even with its obligation to buy, Ready Mix's power to prevent third party sales by withholding consent would render the agreement a "hard bargain" from Brem–Rock's standpoint. We cannot say, however, as a matter of law, that retaining such power is so "monstrously harsh" as to be unconscionable. *See Montgomery Ward & Co. v. Annuity Bd. of S. Baptist Convention*, 16 Wn. App.. 439, 556 P.2d 552 (1976). The whole thrust of the contract is that Ready Mix sought and obtained control over distribution of the products taken from the gravel pit in order to protect its investment in the "batch plant" and to prevent depletion of the pit.[9] Further, the fact that the Goits did not read the final draft because they assumed that the less restrictive language of the earlier draft was included does not make the final agreement

---

[8]The trial court expressly concluded that the fully integrated document was an enforceable contract between the parties. If, however, the contract had in fact lacked a "corresponding duty" by Ready Mix, as the trial court found, the contract would be unenforceable for lack of mutuality, not unconscionable. *See Harvey v. Fearless Farris Wholesale, Inc.*, 589 F.2d 451, 461 (9th Cir. 1979).

[9]See footnote 2, *supra*.

unconscionable. *Fraass Surgical Mfg. Co. v. United States,* 571 F.2d 34, 40 (Ct. Cl. 1978).

Because the trial court erroneously refused to give any effect to the consent requirement contained in paragraph 5 of the final agreement, the trial court's resolution of the other issues must necessarily be examined in light of our holding. During trial the court held that the final agreement between Ready Mix and Brem–Rock was a final integration and could not be varied by parol evidence. The court further ruled, however, that the agreement, while an integrated document, was ambiguous as to the meaning of the word "materials" in paragraph 5 and, accordingly, parol evidence was admissible on that issue. We agree with these rulings. *See Lynch v. Higley,* 8 Wn. App. 903, 510 P.2d 663 (1973); *Weyerhaeuser Co. v. Burlington N., Inc.,* 15 Wn. App. 314, 549 P.2d 54 (1976). Further, our resolution of the unconscionability issue does not dictate different results on these issues.[10] Because the trial court held paragraph 5 unenforceable, it made no finding as to the meaning of "materials," *i.e.,* whether it was intended to apply only to the specific type of sand and gravel that met Ready Mix's needs or whether it meant all kinds of products taken from the pit.[11] Consequently, we remand this case in order that a fact finder may determine what the parties intended by the word "materials."

The alleged subsequent oral "agreement" between Warnack and Martin Goit that Ready Mix would be entitled to

---

[10]Because the trial court ruled paragraph 5 unenforceable on the ground of unconscionability, it relied on the earlier draft to find that the parties contemplated third party sales. Had the trial court's unconscionability ruling been correct, then looking to the earlier draft would have been appropriate as the final agreement, absent the unenforceable paragraph 5, would have been silent as to third party sales. Because we hold paragraph 5 is not unconscionable, however, the fact that the earlier draft contemplated third party sales becomes irrelevant, as paragraph 5 unambiguously prohibits third party sales absent Ready Mix's consent.

[11]Defendants concede that the prohibition on third party sales was not intended to include topsoil.

a $1.15 per ton deduction in return for its consent to third party sales presents a more troublesome issue. The trial court refused to hear any evidence of this "agreement" on the ground that it violated the statute of frauds concerning contracts not to be performed within a year. RCW 19.36-.010(1). In so holding, the trial court relied on *A.J. Hamilton, Inc. v. Atlas Freight, Inc.,* 184 Wash. 199, 50 P.2d 522 (1935), which held that under the statute of frauds a term in a contract not to be performed within a year could not be orally modified or waived and the doctrine of part performance is not available to remove the unenforceability of the oral contract. The trial court reasoned that because the contract between Ready Mix and Brem–Rock was for 5 years, it could not be performed within a year and thus under *Hamilton* the consent requirement could only be altered by a writing.

■ Reliance on the holding in *Hamilton* is extremely questionable.[12] Prior to 1971 it truly could have been said that the remedy of legal damages was unavailable when based upon contracts within the statute of frauds even when such contracts had been partly performed. In *Miller v. McCamish,* 78 Wn.2d 821, 479 P.2d 919 (1971), a unanimous court declared at pages 827–28 that the reasoning which lay behind this rule of law was "somewhat analogous to uncritical tautology, or old cliches, which lack pragmatic justification." Accordingly, the court held at page 829

> where an oral contract or agreement is satisfactorily demonstrated under the existing test applied by this court, such oral contract or agreement, within the statute of frauds but exempted therefrom by part performance, may serve as a basis for *an action at law for money damages.* We premise this holding upon the reasoning

---

[12]We are not unmindful of the carefully considered opinion of another division of this court, *Trethewey v. Bancroft–Whitney Co.,* 13 Wn. App. 353, 534 P.2d 1382 (1975). Nevertheless, we view the thrust of *Miller v. McCamish,* 78 Wn.2d 821, 479 P.2d 919 (1971) (which was not cited in *Trethewey*) as authority for the proposition that this jurisdiction no longer adheres to the rule that part performance is not applicable to the "not to be performed in one year" provision of the statute of frauds.

that, to hold otherwise, would be to defeat the legislative intent inherent in the statute of frauds.

(Italics ours.)

The court appeared to have indicated that the "existing test" was proof of the oral contract and its part performance required "clear and unequivocal" evidence. More recently, however, in *Powers v. Hastings,* 93 Wn.2d 709, 612 P.2d 371 (1980), the court announced that when legal damages are sought evidence less than "clear and unequivocal" suffices to prove the oral contract and its performance in part.

Accordingly, Ready Mix should be given the opportunity at a new trial to present evidence in support of its contention that the parties entered into a postagreement oral contract regarding sales by Brem–Rock to third parties and that that contract had been partially performed.

Notwithstanding our holding that a new trial be granted, we deem it necessary to discuss the consequences of Ready Mix's alternative argument that the so–called "oral agreement" between Martin Goit and Warnack was a separate agreement terminable at will and that the only "modification" of the basic contract was Ready Mix's waiver of its right to insist upon *written* consent to any third party sales. We find that argument also persuasive.

In our opinion, paragraph 5 of the contract is a clear expression of the intention of the parties that at some time in the future they might consider the circumstances under which Brem–Rock would be given authority to sell to third parties. Both parties acknowledge that they did in fact discuss the matter of those sales in December 1976 and January 1977. Martin Goit acknowledges that he was told by Warnack in January that Brem–Rock's sales to third parties would be tolerated by Ready Mix only on condition that Ready Mix would deduct from its payments to Brem–Rock the sum of $1.15 for each ton of material which Brem–Rock sold to other parties. Martin Goit insists, however, that Brem–Rock had a right to sell to third parties without the necessity of obtaining Ready Mix's consent.

That contention, as we have demonstrated, was erroneous. Accordingly, each sale made by Brem–Rock, whether Goit intended it or not, constituted an "acceptance by performance" of Ready Mix's conditional offer to permit the sales. As such, a unilateral contract arose with each sale; Brem–Rock fully performed each time a sale was made. Thus, each contract, as made, was totally outside the ambit of the statute of frauds.

Furthermore, Warnack insists that his consent was only temporary and subject to change at any time—so long, of course, as the change was communicated to Brem–Rock. If that was the nature of Ready Mix's consent—and it is the function of the trier of fact to resolve that issue—then clearly no statute of frauds problem exists.

Finally, even if a subsequent trier of fact determines that no enforceable contract, bilateral or unilateral, was ever entered into, impliedly or expressly, and no consent was ever given by Ready Mix, Brem–Rock was contractually prohibited from making sales to third parties. Its continued unauthorized sales constituted a breach of the contract for which Ready Mix may be entitled to damages. Any new trial must take into consideration all the issues which flow from Ready Mix's allegations of contract damages.

That portion of the judgment awarding Brem–Rock the sum of $33,872.53 as a balance due from Ready Mix is reversed, and this matter is remanded for new trial for resolution of such of the issues discussed herein that the evidence warrants.

REED, C.J., and PETRICH, J., concur.