
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| PACIFIC SHORELINE PROPERTIES, LLC, a California Limited Liability Company, | ) ) ) | No. 40173-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| FIRST LIBERTY BOND, LLC, a Washington Limited Liability Company, | ) ) | |
| | ) | |
| Appellant. | ) | |

COONEY, J. — Jordan Fisher and Maryann and Todd Prescott executed a Purchase and Sale Agreement (PSA) whereby Mr. Fisher's limited liability company, Pacific Shoreline Properties, LLC, sought to purchase an apartment complex from First Liberty Bond, LLC, the Prescotts' limited liability company. The agreement fell through after months of working toward satisfying contingencies and preparing for closing. Thereafter, First Liberty refused to return Pacific Shoreline's earnest money. Pacific

Shoreline filed suit against First Liberty, seeking specific performance and the return of its earnest money. Pacific Shoreline's complaint was tried to the bench. At the conclusion of trial, the court entered extensive findings of fact and conclusions of law, and judgment in favor of Pacific Shoreline.

First Liberty appeals, arguing many of the court's findings are unsupported by the evidence and are erroneous. In particular, First Liberty argues: (1) the specific closing date contained in a later addendum to the PSA controlled over an earlier addendum's uncertain closing date; (2) the court's findings and conclusion that promissory estoppel and waiver, though moot, applied in the alternative are erroneous; (3) the court's findings and conclusions related to Pacific Shoreline's ability to close on the PSA are not supported by substantial evidence; (4) the court's findings and conclusions related to First Liberty's breach of the terms of the PSA are not supported by substantial evidence; and (5) the court's damages award is not supported by substantial evidence and is improper.

We conclude the trial court erred in finding the closing deadline contained in a later addendum to the PSA controlled over an earlier addendum's uncertain closing date. However, we affirm the trial court, holding (1) the court's findings and conclusion that promissory estoppel and waiver, though moot, applied in the alternative were not erroneous; (2) the court's findings and conclusions related to Pacific Shoreline's ability to close on the PSA are supported by substantial evidence; (3) the court's findings and conclusions related to First Liberty breaching the PSA are supported by substantial

evidence; and (4) the court's damages award is supported by substantial evidence and was proper. Lastly, we award Pacific Shoreline its attorney fees on appeal pursuant to the PSA.

BACKGROUND

First Liberty Apartments (Property), located in Liberty Lake, Washington, is comprised of 75 units and is owned by First Liberty. First Liberty is 99.99 percent owned by "USA Institutional Tax Credit Fund LLP d/b/a USA Institutional Tax Credit Fund LXIV, LP," the "investor member." Clerk's Papers (CP) at 349. Ms. Prescott and Mr. Prescott each own 50 percent of First Liberty Associates, LLC, which has a .009 percent ownership interest in First Liberty and is the managing member of First Liberty, making the Prescotts "the individuals that manage First Liberty." CP at 349.

First Liberty's operating agreement provides that the managing member "shall not, without the Consent of the Investor Member have any authority to: sell . . . the assets of [First Liberty]." CP at 353. "Consent" is defined as "prior written consent or approval of the Investor Member . . . ." CP at 352-53.

In 2007, First Liberty obtained approval from the Washington State Housing Finance Commission (WSHFC) to operate the Property as a low-income housing project. WSHFC regulates rents charged in low-income housing projects. First Liberty and WSHFC entered into a regulatory agreement that requires written consent from WSHFC to sell the Property. In 2009, First Liberty and WSHFC entered into an extended use

agreement that also requires written consent from WSHFC to sell the Property as well as an application fee of $3,162. The WSHFC Property Transfer Tax Credit Compliance Procedures Manual requires the seller and buyer to submit various documents, as well as the application fee, in order to sell the Property. The compliance manual also provides: "'[t]he Commission makes no guarantee and provides no assurance that it can execute the transfer agreement by the owners' closing date if the required fee and correct documentation are not received by the Commission at least 45 days prior to the closing date.'" Rep. of Proc. (RP) (May 10, 2023) at 397.

In early 2020, River Vorhees, a real estate agent, called Ms. Prescott and asked if she was interested in selling the Property. Ms. Prescott indicated she would be open to selling. Mr. Vorhees then contacted Mr. Fisher and inquired whether Pacific Shoreline was interested in purchasing the Property. Pacific Shoreline is a California limited liability company whose principal, sole owner, and managing member is Mr. Fisher. Mr. Fisher expressed an interest in using the Property as part of a Section 1031 exchange.[1]

---

[1] "Section 1031 is a section of the Tax Code that provides, among other things, for deferred capital gains." CP at 354. Mr. Fisher testified he was selling property in Utah around the same time he was attempting to purchase the Property, and that he thought the Property would "make a good Section 1031 exchange for the property he was selling" in Utah. CP at 354.

On March 18, 2020, Ms. Prescott signed an exclusive sale listing agreement with Mr. Vorhees, stating, in part, "'Seller warrants that Seller has the right to sell the Property on the terms set forth in this Agreement.'" CP at 354. The parties executed the PSA on the same day.[2] Paragraph 12 of the PSA contained various representations. One such representation was that the "Seller is authorized to enter into the Agreement, to sell the Property, and to perform its obligations under the Agreement . . . ." Ex. P-1 at 5. The sale price of the Property was $9,000,000. The PSA required Pacific Shoreline to deposit $150,000 of earnest money into escrow. The Prescotts never sought, nor received, written consent from the investor member of First Liberty to sell the Property.

The PSA also contained multiple addendums. One such addendum was executed the same day as the PSA (March Addendum) which provides, in relevant part:

> The following is part of the Purchase and Sale Agreement dated March 5, 2020 . . . .
>
> 1. This sale is subject to and contingent upon WSHFC approval and approval by Spokane County.
>
> 2. FIRST ESCROW EXTENSION. In order to facilitate financing, Buyer may extend escrow up to 30 days with an additional $150,000 deposited into escrow. The additional earnest money will be non-refundable and applied to the purchase price.
> . . . .
>
> 4. CONFLICT OF TERMS. In the event any of the terms and or conditions of this Addendum/Amendment Agreement conflict with the Purchase and

---

[2] The PSA's reference date was "March 5, 2020." Ex. P-1 at 1.

> Sale Agreement, the terms of this Addendum/Amendment Agreement shall prevail.
>
> . . . .
>
> 6. Closing is subject to bond financing and payoff timing via Bank of America & WSHFC. Timing is dependent upon their required time frames and could be delayed due to COVID-19 business disruption. Seller is not held responsible for any such delays or approvals.

Ex. P-1 at 14. Paragraph 6 was handwritten by Ms. Prescott. As of June 2021, the Prescotts were still working on paying off the Bank of America bonds, and the Prescotts never delivered the bond payoff amount to escrow for closing.

Around the time the PSA was executed, the COVID-19 pandemic began. Due to COVID-19 business disruptions, Mr. Fisher decided not to move forward with the sale, and Pacific Shoreline's $150,000 of earnest money was returned. However, the parties decided to proceed with the purchase and sale of the Property after COVID-19 disruptions had subsided in November 2022. The parties utilized the original PSA, including the March Addendum, in addition to executing an additional addendum (November Addendum). The November Addendum states, in relevant part:

> The following is part of the Purchase and Sale Agreement with Reference Date March 5, 2020 . . . .
>
> IT IS AGREED BETWEEN THE BUYER AND SELLER AS FOLLOWS:
>
> REMOVAL OF FEASABILITY CONTINGENCY, Buyer's feasibility study of the Property is approved contingent upon the purchase price being $9,100,000.
>
> . . . .
>
> Transaction to close by 1/30/21.
>
> . . . .

     ALL OTHER TERMS AND CONDITIONS of the Agreement remain
unchanged.

Ex. P-1 at 17.  After the November Addendum was executed, Pacific Shoreline again

deposited $150,000 in earnest money into escrow.

     After the PSA was resurrected, Mr. Fisher and the Prescotts began preparing the

WSHFC application.  WSHFC required submission of various documents, some as the

obligation of Mr. Fisher and others the obligation of the Prescotts.

     It was recommended that Mr. Fisher partner with a nonprofit affordable housing

entity to make the WSHFC "approval process go smoother."  CP at 362.  Pacific

Shoreline then partnered with the Foundation for Affordable Housing (FFAH), located in

Southern California, and "began collaborating with it to prepare the WSHFC

application."  CP at 362.  Mr. Fisher also attended a week-long course to become

WSHFC certified and paid WSHFC the $3,162 application fee.

     In January 2021, the Prescotts suggested Pacific Shoreline switch its nonprofit

partner from FFAH to Salem Arms, a local nonprofit partner.  Although the WSHFC

application was nearly complete, the application was delayed based on the substitution of

the nonprofit partner.  On January 22, 2021, shortly after Mr. Fisher changed nonprofit

partners and eight days before the closing deadline listed in the November Addendum,

Ms. Prescott "requested his permission to work on the [WSHFC] application on

[Mr. Fisher's] behalf."  CP at 362.  Mr. Fisher welcomed and appreciated Ms. Prescott's

assistance. On February 1, Mr. Fisher received a letter "from Pacific Premiere Bank" approving a $6.1 million loan. RP (May 8, 2023) at 177.

After January 30, 2021, the parties continued to work collaboratively on the WSHFC application. The parties were informed that the WSHFC application had been approved on May 25, 2021. The same day, Mr. Vorhees sent an e-mail to Keith Newell at Spokane Title stating that Mr. Fisher was hoping to close the transaction the following week. The next day, Mr. Newell responded, writing, "Hello, River: Are the sellers ready to proceed? I left a call for Todd [Prescott] to inquire about that, and he texted back saying he is in meetings all day today but that he would get back to me." CP at 364. Mr. Fisher sent the Prescotts an e-mail on the same day, requesting various records for the Property that were needed for closing.

On May 27, Ms. Prescott sent an e-mail to Mr. Newell and Brad Britzman, the attorney assisting the Prescotts in closing, urging, "Please do not process any further on this closing until you hear further from us. Can you please let us know if the Buyer has a 1031 exchange as part of this transaction." CP at 365. Neither Mr. Vorhees nor Mr. Fisher were copied on this correspondence. Mr. Newell responded that he would "put this file on hold for the time being." CP at 365. The Prescotts then sent an e-mail to Mr. Britzman: "Lets stop progress on the sale, we are way out of contract on this. Please set the deal aside at this point. Will get back to you on a plan." CP at 365. Again, neither Mr. Vorhees nor Mr. Fisher were copied on this e-mail. On June 3, Ms. Prescott

8

sent an e-mail to WSHFC, without copying Mr. Fisher or Mr. Vorhees, explaining, "This transaction has not closed and may not as it is out of contract. We will advise. Thanks for your patience." CP at 366.

On June 8, Mr. Fisher sent an e-mail to the Prescotts writing:

> I wanted to follow up on last week's call. Time is of the essence for me with my 1031 exchange. Can you please let me know if there is a possibility of completing the transaction. A ton of work has been put into this deal and I do have a seven figure tax exposure if we cannot complete. Thanks so much.

CP at 366. Ms. Prescott responded and scheduled a time to speak over the phone on June 11.

On June 11, Mr. Fisher, Mr. Vorhees, and the Prescotts participated in a phone call in which the Prescotts indicated they still needed to pay off the bonds with Bank of America. Following the phone call, Mr. Vorhees sent an e-mail to the Prescotts and Mr. Fisher recapping the phone call:

> Just a recap of our phone call this morning. We need approval from Bank of America in order to clear the last "hurdle" before the property can close. You're going to send over the key bullet points that outline what is needed for us to close in an email on Monday. You made it clear that you're willing to assist in closing this transaction with Jordan Fisher.
>
> Jordan is intending to do what is needed to honor the contract and close. We're committed to seeing this through.

Ex. P-93. The Prescotts did not respond to this e-mail nor contest the contents of the message. Mr. Fisher sent follow-up e-mails to the Prescotts on June 15 and 16. Mr. Prescott finally responded to Mr. Fisher on June 18 with, "We are in the middle of

9

negotiating a deal for a community we have to a national public home builder. Maryann is still getting thru [sic] the bond questions we talked about on our last call." CP at 367.

After 10 more days of silence from the Prescotts, Mr. Fisher sent e-mails to the Prescotts requesting an update on June 28 and again on July 8. On July 14, after still receiving no response from the Prescotts, Mr. Fisher e-mailed them again stating: "Following up again. Escrow is still open with my 150k. Do you intend to cancel escrow?" CP at 368. Two weeks later, after still receiving no response from the Prescotts, Mr. Fisher sent an e-mail to Mr. Newell requesting Pacific Shoreline's earnest money be returned since "the seller no longer responds to me." CP at 368. Mr. Newell responded that he could not release Pacific Shoreline's earnest money without consent from the Prescotts.

On August 18, Mr. Fisher sent an e-mail to the Prescotts asking if there was "[an]y update here? Todd/Maryann—if you're not going to sell me the property—please kindly acknowledge a return of my earnest money. Thanks." CP at 369; Ex. P-102. The Prescotts promptly responded, "We are actually working on it this week. Our apologies." CP at 369; Ex. P-102. After this e-mail, the Prescotts never again contacted Mr. Fisher and did not return his earnest money.

Pacific Shoreline filed suit against First Liberty on November 8, 2021, seeking specific performance of the PSA and for an award of "incidental damages as well as costs, expenses, interest, and attorney's fees as allowed by the PSA." CP at 7. Pacific

Shoreline later amended its complaint to include a cause of action under the doctrine of promissory estoppel.  Pacific Shoreline brought an unsuccessful motion for summary judgment prior to trial that alleged, in part, that First Liberty waived the January 30, 2021, closing date.

Pacific Shoreline's complaint was tried to the bench sitting without a jury.  The parties stipulated to the admission of 117 exhibits, including the PSA, its addenda, and various e-mail communications.  Mr. Fisher, Mr. Prescott, Ms. Prescott, and Timothy Ufkes, an expert on valuation, testified at trial.[3]

Mr. Fisher testified consistent with the above.  He also testified to securing financing for the Property.  He testified that, after executing the November Addendum, he:

> [S]igned a term sheet with Pacific Premiere Bank, which is my lender. And so I wired them the application fee to them, and they ordered third-party appraisal. So I think that I looked at that right away, because we had the—it was a lender I'd done maybe close to ten deals with, so they're my relationship bank. I have my deposits with them and somebody I work really well with.

RP (May 8, 2023) at 57.  Then, in "mid January" 2021, his loan officer indicated "underwriting was complete, and the loan [for the Property] was approved."  RP (May 9, 2023) at 175.  Mr. Fisher also testified he was provided a letter "from Pacific Premiere Bank" approving his loan on February 1, 2021.  RP (May 9, 2023) at 177.  He claimed he

---

[3] A deposition of Mr. Vorhees was also read into the record.

had received the same or a similar letter near the end of January, but that letter was not admitted into evidence. Mr. Fisher stated that as of January 30, 2021, his "financing was in place," and that he "already had the financing approval." RP (May 8, 2023) at 146. Mr. Fisher testified that "somewhere in May [WSHFC] finally approved the transfer. I had my loan in place since January. We were all ready to go." RP (My 8, 2023) at 44. First Liberty refrained from objecting to this testimony.

Ms. Prescott testified that, as of January 2021, First Liberty did not have "written consent from the investor member" to sell the Property. RP (May 9, 2023) at 347. Ms. Prescott later admitted that, as of June 2021, they had still not received consent from the investor member of First Liberty to sell. She testified the bond payoff was never delivered to escrow and, as of June 2021, the bonds were not paid off. Finally, Ms. Prescott asserted she valued the Property at $6.242 million at the time of trial.

Mr. Prescott testified that Mr. Vorhees and Mr. Fisher were informed the deal was dead. In support of this testimony, Mr. Prescott offered exhibit 104, an e-mail stating, in relevant part, "Jordan/River . . . Deal dead . . . We will be able to do a new purchase and sale agreement." Ex. P-104. However, the trial court found exhibit 104 was actually a draft e-mail that was never delivered. The court noted, "The email is different from the other emails sent by M. Prescott and T. Prescott as it does not have a 'From' category." CP at 366.

Mr. Ufkes testified as an expert on the topic of the Property's valuation. Mr. Ufkes is vice-president of investments at Marcus and Millichap, "the largest real estate firm in the United States," and he is an "investment real estate broker." RP (May 9, 2023) at 180-81. He testified he "specializes in apartment sales[,]" has extensive experience with low-income housing properties, and that he has worked with WSHFC in the past. First Liberty did not object to Mr. Ufkes being an expert on valuation.

In regard to the valuation of the Property, Mr. Ufkes testified he analyzed "the income approach to value," and "the sales comparison approach to value," the "current rents for the immediate market," the "current sales for the entire market," and "the maximum allowable rents based on WSHFC." RP (May 9, 2023) at 205-06. With this foundation, Mr. Ufkes opined, "[i]n the absence of having current financials of the property, [$10.9 million] would be my estimate of the value given the sales comparables, the rent comparables, and the operations of the property with the maximum allowable rents by the [WSHFC]." RP (May 9, 2023) at 206. He testified the value range for the Property was between $10.4 and $11.4 million. First Liberty did not object to this testimony.

The court issued comprehensive findings of fact and conclusions of law after the trial had concluded. The court found in favor of Pacific Shoreline and, rather than ordering specific performance, ordered the return of Pacific Shoreline's $150,000 in earnest money and awarded Pacific Shoreline $1,300,000 in damages. The damages

accounted for the difference between the agreed upon sale price of $9.1 million and the low end of Mr. Ufkes' valuation of the Property at $10.4 million. The court also awarded Pacific Shoreline its attorney fees pursuant to the PSA.

The court found, in relevant part, that the March Addendum's uncertain contingent closing date prevailed over the November Addendum's specific closing date of January 30, 2021. The court also entered various findings and conclusions related to Pacific Shoreline's financing and ability to close. The court found and concluded the Prescotts lacked authority to sell the Property and, by stopping the closing of the transaction, breached the PSA. Additionally, the court found and concluded the equitable doctrines of promissory estoppel and waiver, though moot, applied in the alternative. Finally, the court found and concluded that Pacific Shoreline was entitled to damages due to First Liberty's breach of the PSA. The court's specific relevant findings and conclusions are addressed in the analysis below.

First Liberty timely appeals. Following submission of the parties' briefing, Pacific Shoreline brought a motion to strike First Liberty's reply brief. Motion to Strike Reply Brief, *Pac. Shoreline Prop., LLC v. First Liberty Bond, LLC*, No. 40173-1-III (Sept. 17, 2024). A commissioner of this court ruled the "motion to strike should be referred to the judges for consideration at the same time the panel considers this matter on the merits." Comm'r Ruling, *Pac. Shoreline Prop., LLC v. First Liberty Bond, LLC*, No. 40173-1-III (Dec. 9, 2024).

ANALYSIS

PACIFIC SHORELINE'S MOTION TO STRIKE

As a preliminary matter, Pacific Shoreline brought a motion to strike First Liberty's reply brief. Pacific Shoreline alleges that First Liberty argued certain testimony was hearsay for the first time on reply in violation of RAP 2.5 and RAP 10.3(c). Thus, Pacific Shoreline requests this court strike First Liberty's reply with leave for First Liberty to file a new brief in accordance with RAP 10.7. First Liberty responds that the argument in its reply was limited to responding to the issues in Pacific Shoreline's responsive brief and was therefore not violative of RAP 10.3(c). We agree with First Liberty.

RAP 10.3(c) states: "A reply brief should conform with subsections (1), (2), (6), (7), and (8) of section (a) and *be limited to a response to the issues in the brief to which the reply brief is directed.*" (Emphasis added.) RAP 10.7 provides that if a party submits a brief that fails to comply with Title 10 of the RAP, this court may "(1) order the brief returned for correction or replacement within a specified time, (2) order the brief stricken from the files with leave to file a new brief within a specified time, or (3) accept the brief."

Here, as First Liberty points out, its argument that certain evidence is hearsay was responsive to Pacific Shoreline's responsive brief. First Liberty argued in its opening brief that substantial evidence did not support the trial court's findings related to Pacific

Shoreline's ability to close on the Property. Particularly, First Liberty challenged the findings that Pacific Shoreline had secured financing sufficient to purchase the Property. In response, Pacific Shoreline pointed to Mr. Fisher's testimony related to his financing and ability to close. On reply, First Liberty argued this testimony was hearsay and therefore not supportive of the court's findings. Because First Liberty's argument was responsive to issues raised in Pacific Shoreline's responsive brief, it was not violative of RAP 10.3(c). We deny Pacific Shoreline's motion to strike First Liberty's reply brief.

WHETHER THE TRIAL COURT CORRECTLY CONSTRUED THE PSA'S CLOSING DATE

First Liberty argues the trial court erred when it found the timing of closing was controlled by the March Addendum rather than the November Addendum's specific date of January 30, 2021. We agree with First Liberty.

When reviewing a trial court's ruling following a bench trial, this court determines whether the trial court's findings are supported by substantial evidence and whether the findings support the conclusions of law. *Real Carriage Door Co. Inc. ex rel. Rees v. Rees*, 17 Wn. App. 2d 449, 457, 486 P.3d 955 (2021). Substantial evidence exists if it is sufficient to persuade a rational, fair-minded person that the finding is true. *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 712, 334 P.3d 116 (2014). We review the evidence, including all reasonable inferences, in the light most favorable to the prevailing party. *Real Carriage Door Co.*, 17 Wn. App. 2d at 457. We will not reweigh credibility on appeal. *Garza v. Perry*, 25 Wn. App. 2d 433, 453, 523 P.3d 822 (2023).

Unchallenged findings of fact are verities on appeal. *State v. Eyman*, 24 Wn. App. 2d 795, 818, 521 P.3d 265 (2022).

The standard of review for contract interpretation depends on the nature of the evidence relied upon. Contract interpretation is left to the trier of fact when analysis depends on the "credibility of extrinsic evidence or . . . a choice among reasonable inferences to be drawn from extrinsic evidence." *Berg v. Hudesman*, 115 Wn.2d 657, 668, 801 P.2d 222 (1990) (quoting *Restatement (Second) of Contracts* § 212 (Am. L. Inst. 1981)). In such a case, interpretation of a contract is a question of fact. *Viking Bank*, 183 Wn. App. at 712. When interpretation of the contract does not depend on the use of extrinsic evidence, it is a question of law reviewed de novo. *Kofmehl v. Baseline Lake, LLC*, 177 Wn.2d 584, 594, 305 P.3d 230 (2013); *Viking Bank*, 183 Wn. App. at 712; *see also Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 164 Wn.2d 411, 424 n.9, 191 P.3d 866 (2008) (noting that when a contract presents no ambiguity and no extrinsic evidence is required to make sense of the contract terms, contract interpretation is a question of law); *Keystone Masonry, Inc. v. Garco Constr., Inc.*, 135 Wn. App. 927, 932, 147 P.3d 610 (2006) ("Absent disputed facts, the legal effect of a contract is a question of law that we review de novo.").

Here, the trial court took testimony and considered numerous exhibits in interpreting the PSA. However, the trial court did not utilize extrinsic evidence in its interpretation of the PSA as contemplated in *Berg*. *Berg* involved a dispute between a

landlord and tenant about the proper formula to be used to calculate rent. 115 Wn.2d at 661-63. To resolve any ambiguity in the lease, the court looked to prior agreements, prior rental income from subtenants, and other values outside of the lease at issue. *Id.* at 672-73. In contrast, here, the trial court's interpretation of the PSA did not depend on extrinsic evidence. Thus, our review is de novo.

First Liberty argues the November Addendum's specific closing date of January 30, 2021, controlled over the earlier March Addendum's uncertain closing date. Pacific Shoreline responds that the conflict of terms provision contained in the March Addendum rendered the timing of closing contained in that addendum controlling.

"During [contract] interpretation, a court's primary goal is to ascertain the parties' intent at the time they executed the contract." *Int'l Marine Underwriters v. ABCD Marine, LLC*, 179 Wn.2d 274, 282, 313 P.3d 395 (2013). Washington courts follow the "objective manifestation theory" of contract interpretation that puts the focus on the reasonable meaning of the contract language to determine the parties' intent. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). "We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Id.* at 504. "[W]e review the contract as a whole, interpreting particular language in the context of other contract provisions." *Viking Bank*, 183 Wn. App. at 713.

If, after analyzing the language and considering extrinsic evidence, when appropriate, a contract provision's meaning is unclear or subject to more than one reasonable interpretation, the provision is ambiguous. *Viking Bank*, 183 Wn. App. at 713. We construe ambiguities against the contract or contract provision's drafter. *Pierce County v. State*, 144 Wn. App. 783, 813, 185 P.3d 594 (2008). And "[w]hen contract provisions conflict, we will harmonize them to the extent possible." *Healy v. Seattle Rugby, LLC,* 15 Wn. App. 2d 539, 545, 476 P.3d 583 (2020). Effect will be given to the provision "that more nearly effectuates the purpose of the entire contract." *Id.*

First Liberty argues the trial court erred in finding paragraph 6 of the March Addendum, handwritten by Ms. Prescott, controlled the closing date. First Liberty asserts the PSA's closing deadline was clearly and unambiguously January 30, 2021. It contends that the PSA terminated after the sale failed to close on January 30, 2021. Pacific Shoreline responds that paragraphs 1 and 6 of the March Addendum controlled the closing date, and the trial court did not err in so finding. We agree with First Liberty.

Paragraph 6 of the March Addendum reads: "Closing is subject to bond financing and payoff timing via Bank of America & WSHFC. Timing is dependent upon their required time frames and could be delayed due to COVID-19 business disruption. Seller is not held responsible for any such delays or approvals." Ex. P-1 at 14. Paragraph 4 of the same addendum reads: "CONFLICT OF TERMS. In the event any of the terms and or conditions of this Addendum / Amendment Agreement conflict with the Purchase and

Sale Agreement, the terms of this Addendum / Amendment Agreement shall prevail." *Id*.

Finally, paragraph 1 of the March Addendum reads: "This sale is subject to and

contingent upon WSHFC approval and approval by Spokane County." *Id*.

Due to COVID-19 disruptions, Pacific Shoreline withdrew from the sale, and its

earnest money was returned. However, after COVID-19 had subsided in November

2020, the parties resurrected the transaction by utilizing the PSA and its addenda.[4]

Additionally, the parties executed the November Addendum that increased the purchase

price to $9.1 million, removed the feasibility contingency, and provided that the

transaction was "to close by 1/30/21." Ex. P-1 at 17. The November Addendum also

stated it "is part of the Purchase and Sale Agreement with Reference Date March 5,

2020," and that "[a]ll other terms and conditions of the Agreement remain unchanged."

*Id*.

The court found, and neither party disputes, that the PSA and its addenda embody

the complete contract. The dispute centers around whether the November Addendum's

specific closing date of January 30, 2021, or paragraphs 1 and 6 of the earlier March

---

[4] The finding to this effect (FF 55) is challenged by First Liberty but they devote no argument to it. Appellant's Op. Br. at 3. Thus, it is a verity on appeal. *Escude ex rel. Escude v. King County Pub. Hosp. Dist. No. 2*, 117 Wn. App. 183, 190 n.4, 69 P.3d 895 (2003) ("It is well settled that a party's failure to assign error to or provide argument and citation to authority in support of an assignment of error, as required under RAP 10.3, precludes appellate consideration of an alleged error."); *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994) ("It is well-established law that an unchallenged finding of fact will be accepted as a verity upon appeal.").

Addendum controlled the closing date. We hold the specific closing date of the November Addendum controls.

Here, the original PSA set closing 80 days from waiver of the feasibility contingency. The March Addendum added that the sale was subject to and contingent on WSHFC approval and approval by Spokane County. It further added that closing was subject to bond payoff timing via Bank of America. CP at 358 ("Timing is dependent upon these required time frames . . . ."). In contrast, the November Addendum removed the feasibility contingence, increased the sale price, and set a closing deadline of January 30, 2021.

Contrary to Pacific Shoreline's argument, the conflict of terms provision contained in the March Addendum applied only in the event any of the terms or conditions of the PSA and its addenda were in conflict. Terms or conditions are not in conflict if they are amended or modified by a subsequent agreement of the parties. Both parties must agree to the modification of a contract in order for such modification to be effective. *Wagner v. Wagner*, 95 Wn.2d 94, 103, 621 P.2d 1279 (1980).

First Liberty and Pacific Shoreline agreed to, and executed, the November Addendum that contained a specific closing date, removed the feasibility contingency, and altered the purchase price from the March Addendum. Accordingly, the modified terms of the November Addendum are not in conflict with the PSA or March Addendum. Specifically, the certain closing date modified the uncertain closing date contained in the

March Addendum. Forsooth, "[i]t is a well-known principle of contract interpretation that 'specific terms and exact terms are given greater weight than general language.'" *Adler v. Fred Lind Manor*, 153 Wn.2d 331, 354, 103 P.3d 773 (2004) (quoting RESTATEMENT § 203(c)).

Citing *Flower v. T.R.A. Industries, Inc.*, 127 Wn. App. 13, 29, 111 P.3d 1192 (2005), First Liberty argues the trial court erred by failing to apply the law of successive amendments to the closing date. In *Flower*, we recognized:

> [W]hen a second contract deals with the same subject matter as did the first contract made by the same parties, but does not state whether or to what extent it is intended to operate in discharge or substitution . . . [t]he two contracts must be interpreted together. In so far as they are inconsistent, the later one prevails; the remainder of the first contract, being quite consistent with the second in substance and in purpose may be enforced.

127 Wn. App. at 29 (quoting *Lynch v. Higley*, 8 Wn. App. 903, 911, 510 P.2d 663 (1973)). Here, the terms of the later November Addendum control over those contained in the earlier March Addendum.

Further, "[a] provision in an agreement making time of the essence is generally treated as evidence of a mutual intent that specified times of performance be strictly enforced." *Mid-Town Ltd. P'ship v. Preston*, 69 Wn. App. 227, 233, 848 P.2d 227 (1993). Citing *Nadeau v. Beers*, 73 Wn.2d 608, 610, 440 P.2d 164 (1968), the *Mid-Town* court noted that our Supreme Court "held that when an agreement makes time of the essence, fixes a termination date, and there is no conduct giving rise to estoppel or waiver, the agreement becomes legally defunct upon the stated termination date if

22

performance is not tendered." *Mid-Town*, 69 Wn. App. at 233. The specific closing date of January 30, 2021, controlled.

Finally, First Liberty argues it had no duty to extend closing because Pacific Shoreline never deposited an additional $150,000 in earnest money as required by paragraph 2 of the March Addendum. This argument is unpersuasive. Paragraph 2 of the March Addendum reads: "FIRST ESCROW EXTENSION. *In order to facilitate financing*, Buyer may extend escrow up to 30 days with an additional $150,000 deposited into escrow." Ex. P-1 at 14 (emphasis added). The plain language of this provision indicates it relates to an extension of closing to facilitate financing. Here, closing could not occur on January 30, 2021, due to reasons other than Pacific Shoreline's ability to secure financing (e.g., lack of WSHFC approval, bond payoff not complete). Thus, Pacific Shoreline was not required to deposit an additional $150,000 to extend closing.

The specific closing date of January 30, 2021, in the November Addendum controlled over the earlier uncertain closing date contained in the March Addendum.

WHETHER THE COURT PROPERLY DETERMINED THAT WAIVER AND PROMISSORY ESTOPPEL APPLY IN THE ALTERNATIVE

First Liberty argues the court erred when it found the equitable doctrines of waiver or promissory estoppel applied in the alternative. Pacific Shoreline responds that the court had a sufficient basis to find waiver and promissory estoppel. We agree with Pacific Shoreline.

First Liberty challenges findings of fact 125 and 126 and conclusion of law 25. In the two challenged findings of fact, the court found:

125. After January 30, 2021, neither T. Prescott nor M. Prescott told Fisher that they believed Pacific Shoreline was out of compliance with the PSA, and that they did not have to go through with the transaction.

126. Similarly, from February 2021 through May 2021, M. Prescott and T. Prescott never told Vorhees that the transaction was dead.

CP at 363. Relatedly, the court concluded:

25. Pacific Shoreline also alleged, in the alternative, causes of action based upon the equitable doctrines of waiver and promissory estoppel. As the Court has found a breach of contract and awarded damages, these two alternative causes of action are now moot. However, the Court concludes that from December 2020 to the May 25, 2021, M. Prescott engaged in unequivocable acts and conduct that conveyed to Fisher that M. Prescott was working to obtain WSHFC approval so that the PSA transaction could be closed shortly after obtaining such approval.

CP at 375.

As a preliminary matter, findings 125 and 126 are supported by substantial evidence. Mr. Fisher was asked at trial: "After January 30, 2021, came and went, did Ms. Prescott or Mr. Prescott ever tell you that you were out of compliance and they did not have to go through [with] the transaction?" RP at 70-71. He answered, "No." CP at 71. He also testified that the Prescotts never told him the "deal was dead" prior to May 2021. CP at 79, 81. Thus, the findings are supported by substantial evidence.

Insofar as a portion of conclusion of law 25 is actually a finding of fact, it too is supported by substantial evidence. The latter part of conclusion of law 25, which states:

"the Court concludes that from December 2020 to . . . May 25, 2021, M. Prescott engaged in unequivocal acts and conduct that conveyed to Fisher that M. Prescott was working to obtain WSHFC approval so that the PSA transaction could be closed shortly after obtaining such approval" appears to be a finding of fact. CP at 375. We review a finding of fact erroneously labeled as a conclusion of law as a finding of fact. *Scott's Excavating Vancouver, LLC v. Winlock Props., LLC*, 176 Wn. App. 335, 342, 308 P.3d 791 (2013). This finding is comparable to finding of fact 166, analyzed below. The same evidence supporting finding of fact 166, as addressed below, also supports this finding (e.g., The Prescotts' conduct in assisting Mr. Fisher with his WSHFC application and advising him to switch nonprofit partners just days before the January 30, 2021, closing date, as well as their communications with Mr. Fisher and others indicating that the Prescotts were working to obtain WSHFC approval in order to facilitate closing once the application was approved.).

First Liberty argues the portion of conclusion of law 25, which is actually a finding of fact, was erroneous because it cannot be reconciled with findings 125 and 126. First Liberty contends the court seemingly found "that the [Prescotts] had a 'duty' to notify [Mr. Fisher] that the PSA had terminated, and that failing that, the PSA did not terminate . . . Yet it concludes that, by failing to tell [Mr.] Fisher that the transaction was dead . . . then the [Prescotts] invited estoppel." Appellant's Op. Br. at 50-51. But the court found no such "duty." Instead, the court found that the Prescotts' actions were

inconsistent with their alleged belief that the transaction was dead after January 30. The court's findings are not inconsistent and are supported by substantial evidence.

Turning to the merits, the court's findings support its conclusion that waiver and promissory estoppel applied in the alternative.

"A purchase and sale agreement with an express expiration date terminates if it is not performed, absent waiver or estoppel." *Ashmore v. Estate of Duff*, 165 Wn.2d 948, 952, 205 P.3d 111 (2009). Waiver and estoppel are "legal conclusions to be drawn from established facts." *Mid-Town*, 69 Wn. App. at 232. Thus, our role on appeal is to determine whether the trial court's conclusions are supported by the facts. *Id.*

*Waiver*

First Liberty argues the court erred in concluding Pacific Shoreline proved waiver. We disagree. The court correctly concluded that waiver applied in the alternative.

"A waiver by conduct occurs if the actions of the person against whom waiver is claimed are inconsistent with any intention other than waiver." *Shinn v. Thrust IV, Inc.*, 56 Wn. App. 827, 843-44, 786 P.2d 285 (1990). Waiver must be shown "by unequivocal acts or conduct showing an intent to waive, and the conduct must also be inconsistent with any intention other than to waive." *Mid-Town*, 69 Wn. App. at 233. The conduct giving rise to waiver must occur before the closing date. *Id.* at 234.

Here, the facts support the court's conclusion that waiver applied in the alternative. In January 2021, prior to the scheduled closing date, Ms. Prescott suggested

that Mr. Fisher substitute nonprofit partners which slowed the process for WSHFC approval. Then, on January 22, 2021, Ms. Prescott requested Mr. Fisher's permission to assist him with the WSHFC application. WSHFC's compliance manual states: "[t]he Commission makes no guarantee and provides no assurance that it can execute the Transfer Agreement by the Owners' closing date if the required fee and correct documentation are not received by the Commission at least 45 days prior to the closing date." RP (May 10, 2023) at 397. Substantial evidence supports the court's finding that the Prescotts engaged in unequivocal acts showing an intent to waive the January 30 closing date. Ms. Prescott knew or should have known that encouraging Mr. Fisher to substitute nonprofit partners would delay the process. Further, Ms. Prescott's request to assist Mr. Fisher with the WSHFC application a mere eight days before the closing deadline is conduct inconsistent with any intention other than waiving the closing deadline. There is no other explanation for Ms. Prescott's conduct. Thus, the court did not err in determining waiver would apply alternatively.

Again, First Liberty argues the court's findings and conclusions were inconsistent. First Liberty points to the court's findings and conclusions related to the Prescotts' lack of authority to sell the property and the findings and conclusions related to waiver and argue "[i]f the Prescott Sellers never had authority to close the sale in the first place, then they could not have 'waived' the closing date." Appellant's Op. Br. at 55. Closing could not occur absent the Prescotts obtaining written consent from the investor member. This

does not, however, deprive the Prescotts of the ability to enter into the PSA or waive

provisions contained in the PSA.  Rather, the Prescotts needed to secure consent from the

investor member at some point prior to closing.  Perchance, the lack of consent motived

the Prescotts' waiver of the closing deadline.  The court's ruling was not inconsistent.

*Promissory Estoppel*

First Liberty argues in their opening brief that the court erred by finding *equitable*

estoppel.  However, as Pacific Shoreline points out, and the court's findings confirm, the

court found *promissory* estoppel applied in the alternative.  In any event, the court did not

err in concluding promissory estoppel applied alternatively.

"Equitable estoppel is based upon a representation of existing or past facts, while

promissory estoppel requires the existence of a promise."  *Klinke v. Famous Recipe Fried

Chicken, Inc.*, 94 Wn.2d 255, 258-59, 616 P.2d 644 (1980).  Promissory estoppel has five

elements: "'(1) [a] promise which (2) the promisor should reasonably expect to cause the

promisee to change his position and (3) which does cause the promisee to change his

position (4) justifiably relying upon the promise, in such a manner that (5) injustice can

be avoided only by enforcement of the promise.'"  *Havens v. C&D Plastics, Inc.*, 124

Wn.2d 158, 171-72, 876 P.2d 435 (1994) (quoting *Klinke*, 94 Wn.2d at 259 n.2).

The elements of promissory estoppel were met.  Here, the Prescotts made a

promise to sell the Property and to work with Mr. Fisher on the WSHFC application. The

Prescotts should have expected Mr. Fisher to change his position based on these

promises, and he did in fact change his position. Mr. Fisher, in conjunction with Ms. Prescott, spent months working on WSHFC approval, and Mr. Fisher even attended a week-long course to become WSHFC certified. Additionally, Mr. Fisher paid a $3,162 transfer fee as a part of his WSHFC application. Mr. Fisher's reliance on the Prescotts' promise to sell him the Property was especially justified considering Ms. Prescott agreed to help him with his WSHFC application. Thus, it would be unjust not to require enforcement of the Prescotts' promise. All of the elements of promissory estoppel were met.

First Liberty argues Mr. Fisher was not injured because he never demonstrated "having possessed the $9.1 million in funds to close" on the Property. Appellant's Op. Br. at 52. However, as discussed in greater detail below, substantial evidence supports the court's findings that Mr. Fisher could have closed. Further, Mr. Fisher *was* injured when the Prescotts reneged on their promise to sell the Property to him. At the very least, Mr. Fisher lost $150,000 of earnest money, paid the WSHFC application fee of $3,162, and spent countless hours on the WSHFC application. At most, he was out the appreciated value of the Property over time had it been sold to him as promised.

The court did not err in determining that the equitable doctrines of waiver and promissory estoppel applied in the alternative.

WHETHER THE TRIAL COURT'S FINDINGS RELATED TO PACIFIC SHORELINE BEING ABLE TO CLOSE ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

First Liberty argues the trial court's findings of fact and conclusions of law related to Pacific Shoreline's ability to close are not supported by substantial evidence. We disagree.

In arguing that Pacific Shoreline had not secured financing and, therefore, was unable to close, First Liberty challenges findings of fact 55, 101, 116, 123, 124, 133 and conclusions of law 13, 14, 15, 16, and 23. As a preliminary matter, Pacific Shoreline contends First Liberty devoted no argument to these challenged findings nor all but one of their challenged conclusions. A party's failure to provide argument and citation to authority in support of an assignment of error precludes appellate consideration of that alleged error. *Escude*, 117 Wn. App. at 190 n.4.

However, the theme of First Liberty's briefing was that Pacific Shoreline had not secured financing and was never able to close. Notably, few of the above-referenced challenged findings of fact and conclusions of law relate to Pacific Shoreline's financing and ability to close. First Liberty dedicated sufficient argument to their assignments of error, insofar as the challenged findings and conclusions relate to Pacific Shoreline's ability to close, to warrant our consideration.

Turning to the merits, the trial court's findings related to Pacific Shoreline's ability to close are supported by substantial evidence. The court found:

116. Following the signing of the November 2020 Addendum/Amendment, Fisher signed a term sheet with his lender and wired them the application fee for his loan.

. . . .

123. In mid-January 2021, Fisher's bank told him that [Pacific Shoreline]'s loan had been approved.

124. On January 27 or 28, 2021, Fisher's bank provided him with a letter of loan approval. On February 1, 2021, Fisher received another letter from the bank stating the same thing.

. . . .

133. After WSHFC approved the application on May 25, 2021, the parties could have closed the transaction in a short period of time thereafter, only subject to bond financing and the Investor Member's written consent.

CP at 362-64.  Relatedly, the court concluded: "13.  After WSHFC approved the transfer application on May 25, 2021, Pacific Shoreline would have been able to close the transaction within a short period of time."  CP at 373.

At trial, Mr. Fisher testified that, after signing the November Addendum, he "signed a term sheet with Pacific Premiere Bank . . . [a]nd . . . wired them the application fee."  RP (May 8, 2023) at 57.  Then, in "mid January" 2021, his loan officer indicated "underwriting was complete, and the loan [for the Property] was approved."  RP (May 9, 2023) at 175.  Mr. Fisher also testified he was provided a letter "from Pacific Premiere Bank" approving his loan on February 1, 2021.  RP (May 9, 2023) at 177.  That letter was admitted as exhibit 106.[5]  Mr. Fisher testified he had received the same or a similar letter

---

[5] The letter states the loan amount is "6,100,000."  Ex. P-106.

near the end of January, but that letter was not admitted into evidence at trial. Mr. Fisher further testified that his "financing was in place," and that he "already had the financing approval" as of January 30, 2021. RP (May 9, 2023) at 146. Mr. Fisher's testimony and the loan approval letter, admitted as exhibit 106, support findings of fact 116, 123, and 124.

Further, finding of fact 133 is supported by substantial evidence, and the supported finding supports conclusion of law 13. Mr. Fisher testified that "somewhere in May, [WSHFC] finally approved the transfer. I had my loan in place since January. We were all ready to go." RP (May 8, 2023) at 44. Ms. Prescott testified that as of June 2021, First Liberty still needed to pay off the bonds with Bank of America and get consent to sell from the "investor limited partner."[6] RP (May 10, 2023) at 417-18. Given Mr. Fisher's testimony, and the fact that as of May 2021 the final task Mr. Fisher had to complete was WSHFC approval, Pacific Shoreline was ready to close once that approval was complete. Finding of fact 133 is supported by substantial evidence and, in turn, supports conclusion of law 13.

---

[6] This testimony also supports challenged finding of fact 102 ("Further, because M. Prescott was still working on the Bank of America Bond issue as of June 11, 2021, the transaction between Pacific Shoreline and First Liberty Bond could not have closed on January 30, 2021, or on any date thereafter through the date of trial, because the Managing Member for First Liberty Bond had not resolved the Bank of America bond issue to allow for closing."). CP at 360.

For the first time on appeal, First Liberty argues Mr. Fisher's testimony regarding his financing and ability to close are "self-serving" and "hearsay" and thus cannot support the trial court's findings. Appellant's Reply Br. at 5-6. This argument is unpersuasive. First, as First Liberty recognizes, self-serving testimony may support a finding of fact as it is the trial court's responsibility to assess credibility. Second, none of the above-referenced testimony was objected to below. Thus, any error in admitting the testimony is unpreserved. RAP 2.5. Third, even if we concluded Mr. Fisher's testimony that his loan officer *told him* he was approved for the loan was hearsay, Mr. Fisher testified that his "financing was in place," and that his "loan [was] in place since January." RP (May 8, 2023) at 44, 52. This testimony independently supports the relevant challenged findings.[7]

Finally, First Liberty argues Pacific Shoreline *never* demonstrated an ability to close the deal because the only evidence of loan approval was for a loan of $6.1 million, far less than the $9.1 million purchase price. However, neither party inquired as to whether Mr. Fisher possessed the additional $2,850,000[8] to close. First Liberty

---

[7] This latter testimony is not hearsay because it is not "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Mr. Fisher did not state someone *told* him this information but instead testified his financing was in place based on his personal knowledge.

[8] Pacific Shoreline needed $2,850,000 above its loan amount to close as it had $150,000 in escrow.

speculates that Mr. Fisher never possessed the funds necessary to close. One could also speculate that Mr. Fisher was planning to pay the remaining $2,850,000 in cash. In any event, Mr. Fisher's testimony that he had financing in place and was "ready to go" supports the trial court's findings that he was able to close. RP (May 8, 2023) at 44.

Substantial evidence supports the court's findings related to Pacific Shoreline's ability to close.

### WHETHER THE TRIAL COURT'S FINDINGS THAT FIRST LIBERTY LACKED AUTHORITY TO SELL AND THEREFORE BREACHED THE PSA ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

First Liberty next argues the trial court erred in finding the Prescotts lacked authority to sell the Property and therefore breached the PSA. Pacific Shoreline responds that the court's findings are supported by substantial evidence. We agree with Pacific Shoreline.

First Liberty does not present arguments in support of all their challenged findings of fact. For this reason, as well as those below, we limit our review to findings of fact 34, 63, 75, 88, 166, 167, and 170 and conclusions of law 3, 4, and 6.

In arguing the trial court erred in finding First Liberty breached the PSA, First Liberty challenge findings of fact 34, 63, 75, 102, 125-167,[9] 169, and 170 and conclusions of law 3, 4, and 6. Again, Pacific Shoreline argues First Liberty failed to

---

[9] Findings of fact 125 and 126 are addressed in the preceding section.

sufficiently devote argument to the majority of these challenged findings. Because First Liberty only devoted argument to those challenged findings of fact that relate to the Prescotts' authority, or lack thereof, to sell the Property, we review those findings only.

Finding of fact 102 is supported by substantial evidence as briefly explained in the preceding section. Further, findings of fact 127 through 163 relate to conduct and communications among Mr. Vorhees, Mr. Fisher, the Prescotts, and others prior to and following WSHFC approval. Most are simply recitations of their e-mail and phone communications. Though First Liberty challenges these findings in its assignments of error section, First Liberty does not argue in its briefing that they are unsupported by substantial evidence, and the majority of these findings contain citations to the relevant exhibits. Any argument related to the communications among the parties and others is not that the findings are not supported, but that the findings do not support the court's conclusions. That argument is addressed below. Moreover, findings of fact 164, 165, and 169 relate to Mr. Fisher and his team's work to close the transaction, following WSHFC approval, and a credibility determination related to the Prescotts, which we will not disturb on appeal and for which the Prescotts devote no argument.

That leaves challenged findings of fact 34, 63, 75, 166, 167, and 170 and conclusions of law 3, 4, and 6. Further, First Liberty challenges finding of fact 88 in its argument section on the issue; we review that finding as well. The court's findings

related to its conclusions that the Prescotts did not have authority to sell the Property are

supported by substantial evidence.  To that effect, the court found:

> 34. Prior to entering into the PSA that is the subject matter of this litigation, the Managing Member of First Liberty Bond did not obtain Consent from the Investor Member to sell First Liberty Apartments.
>
> . . . .
>
> 63. Paragraph 12 of the PSA contains various Seller's Representations. Paragraph 12 states in pertinent part: ". . . Seller is authorized to enter into the Agreement, to sell the Property, and to perform its obligations under the Agreement . . ." (P-1, p. 5). This was an inaccurate representation.
>
> . . . .
>
> 75. As of January 30, 2021, the Managing Member, the Prescotts, did not have written consent from the Investor Member to sell the property. Consequently, the transaction with Pacific Shoreline could not have been closed on that date without breaching the Operating Agreement. M. Prescott did not want to violate the Operating Agreement because of her longstanding reputation with the Investor Member.
>
> . . . .
>
> 88. The inaccurate Seller's Representation in paragraph 12 of the PSA misled Fisher into believing the Seller had authority to sell the property.
>
> . . . .
>
> 166. The Court finds that throughout the months leading up to the May 25, 2021, WSHFC approval, M. Prescott engaged in unequivocable acts and conduct that conveyed to Fisher, Vorhees, and the staff at WSHFC that M. Prescott was working to obtain WSHFC approval so that the PSA could be closed shortly after obtaining such approval.
>
> 167. The Court finds that based upon their conduct, upon learning WSHFC had approved the transfer of the property application, M. Prescott and T. Prescott never had any intention of closing the transaction.
>
> . . . .
>
> 170. During the months that the parties appeared to be working collaboratively on obtaining WSHFC approval, M. Prescott and T. Prescott had actually been acting in bad faith. The evidence established that M. Prescott and T. Prescott had no intention of closing on the PSA.

CP at 353, 356-58, 369-70.

Paragraph 12 on page 5 of the PSA stated: "SELLER REPRESENTATIONS . . . Seller represents to Buyer that, to the best of Seller's actual knowledge, each of the following is true as of the date hereof: (a) Seller is authorized to enter into the Agreement to sell the Property, and to perform its obligations under the Agreement." Ex. P-1 at 5. However, Ms. Prescott testified at trial that as of January 2021, First Liberty, as the seller did not have "written consent from the investor member" to sell the Property. RP (May 10, 2023) at 347. She also testified:

> [PLAINTIFF'S COUNSEL]. On January 30th, 2021, because you did not have the consent, written consent, from the investor member to sell the property, you could not have closed that date, correct?
>
> [MS. PRESCOTT]. Correct. Excuse me, no. That is not correct. I could have closed that day, but I would have been in violation of my agreement with the investor limited partner. I could have closed, though.
>
> [PLAINTIFF'S COUNSEL]. Well, you need written consent to close?
>
> [MS. PRESCOTT]. But I could violate that and I could have closed.
>
> [PLAINTIFF'S COUNSEL]. But you didn't violate it to close, did you?
>
> [MS. PRESCOTT]. No. I have a long-standing reputation.
>
> [PLAINTIFF'S COUNSEL]. And you had no intent of violating the provision that says you need to give written consent?
>
> [MS. PRESCOTT]. It would not be smart in the long-term for me to violate a term with a substantial investor of ours, yes.

RP (May 10, 2023) at 347.  This testimony, coupled with the Prescotts' representation in the PSA that they had authority to sell the Property, supports findings of fact 34, 63, 75, and 88.

Findings of fact 166, 167, and 170 are also supported by substantial evidence. Ms. Prescott and Mr. Fisher testified that Ms. Prescott began assisting Mr. Fisher with his WSHFC application in January 2021.  Further, the court found that after WSHFC approved the application in May, Mr. Vorhees communicated with Mr. Newell at Spokane Title to inquire about closing the transaction.  From there, Mr. Newell, Mr. Vorhees, and Mr. Fisher attempted to coordinate closing with the Prescotts. However, unbeknownst to Mr. Fisher and Mr. Vorhees, the Prescotts instructed Mr. Newell not to "process any further on this closing" and "to stop progress on the sale." CP at 365-66.  The Prescotts also, without informing Mr. Vorhees or Mr. Fisher, instructed WSHFC that the "transaction has not closed and may not" close.  CP at 366.

Mr. Fisher, still in the dark about the Prescotts' communications with Mr. Newell and WSHFC, contacted the Prescotts in early June to inquire about closing. The Prescotts, Mr. Fisher, and Mr. Vorhees had a phone call discussing the bonds that still needed to be paid off and what needed to be done to facilitate closing.  The Prescotts then became largely unresponsive to e-mail communications.  However, despite Mr. Prescott's testimony that they informed Mr. Fisher and Mr. Vorhees that the deal was dead, the Prescotts sent an e-mail to the two in late June stating that Ms. Prescott was "still going

thru [sic] the bond questions we talked about on our last call." CP at 367. Mr. Fisher sent numerous e-mails to the Prescotts over the next month-and-one-half but received no response. Finally, on July 30, 2021, Mr. Fisher sent an e-mail to Mr. Newell requesting his earnest money be returned because it appeared the Prescotts were no longer willing to sell the Property. Mr. Newell informed Mr. Fisher he could not release the earnest money without the seller's consent. In mid-August, Mr. Fisher again sent an e-mail to the Prescotts asking for an update or return of his earnest money. Finally, the Prescotts responded that they were "actually working on it this week. Our apologies." CP at 369. This was the last communication the Prescotts had with Mr. Fisher, and his earnest money was never returned.

The Prescotts' conduct of assisting Mr. Fisher with his WSHFC application and their subsequent communications with him indicated that the Prescotts were working to obtain WSHFC approval in order to facilitate closing once the application was approved. Thus, finding of fact 166 is supported by substantial evidence. Further, following approval of the WSHFC application, the Prescotts' communications with Mr. Fisher, Mr. Vorhees, WSHFC, and Mr. Newell, or lack thereof, coupled with their conduct, indicated they did not actually intend to close the deal. Thus, finding of fact 167 is supported by substantial evidence. Finally, the court's finding that, "[d]uring the months that the parties appeared to be working collaboratively on obtaining WSHFC approval," the Prescotts "had actually been acting in bath faith" and had "no intention of closing on

the PSA" is also supported by substantial evidence. CP at 370. The above-referenced evidence and findings demonstrated that though the Prescotts agreed to assist Mr. Fisher with the WSHFC application, their conduct after approval indicated they never intended to close and were therefore acting in bath faith. Thus, finding of fact 170 is supported by substantial evidence.

The trial court's supported findings, in turn, support its court's conclusions of law. The court concluded:

> 3. First Liberty Bond breached the PSA with Pacific Shoreline.
>
> 4. First Liberty Bond's Seller Representation in the PSA that it was authorized to sell the property is untrue and a breach of the PSA. The Managing Member of First Liberty Bond was required by the Operating Agreement to obtain written consent from the Investor Member, who owns 99.99% of First Liberty Bond, to sell the property. The Managing Member of First Liberty Bond never obtained written consent from the Investor Member.
>
> . . . .
>
> 6. As the Managing Member of First Liberty Bond never obtained a written consent from the Investor Member to sell the property, First Liberty Bond was unable to close on the transaction and, therefore, was in in breach of the PSA.

CP at 372-73. These challenged findings and conclusions cannot be viewed in isolation. Ms. Prescott admitted she never obtained written consent to sell from the investor member. Even if the Prescotts technically *could have* closed in the absence of consent from the investor member, the court found that it was, in part, the lack of consent that

caused them to cancel the transaction that therefore breached the PSA. When read in context, conclusions of law 3, 4, and 6 are supported by substantial evidence.

First Liberty's main argument pertaining to whether it breached the PSA by not obtaining written consent to sell from the investor member is based, again, on their contention that it was *Pacific Shoreline* who was unable to close due to lack of funds. This argument was disposed of in the preceding section. First Liberty next points to Pacific Shoreline's failure to deposit an additional $150,000 into escrow to extend closing. Contrary to this argument, the PSA stated that Pacific Shoreline could extend closing "[i]n order to facilitate financing" by depositing $150,000 into escrow. Ex. P-1 at 14. Pacific Shoreline did not need to extend closing to facilitate financing; instead, closing was extended because Pacific Shoreline was awaiting WSHFC approval and bond payoff by First Liberty.

The court's findings are supported by substantial evidence and the findings support the court's conclusions of law.

WHETHER THE TRIAL COURT'S AWARD OF DAMAGES WAS PROPER

First Liberty argues Mr. Fisher did not perform sufficiently to qualify him for damages. They also argue the amount of the trial court's damages award was improper and that Mr. Ufkes' opinion on the value of the Property should not have been accepted

by the court for purposes of damages. First Liberty challenges finding of fact 191 and conclusions of law 20, 23, 24, and 26.[10] We disagree with First Liberty.

### Entitlement to Damages

"[T]he general rule governing breach of contract damages is that such damages should be in an amount sufficient to place the injured party in the same economic position it would have occupied had the contract been fully performed." *TMT Bear Creek Shopping Ctr., Inc. v. Petco Animal Supplies, Inc.*, 140 Wn. App. 191, 211, 165 P.3d 1271 (2007).

In relation to Pacific Shoreline's entitlement to damages, the court concluded:

20. Pacific Shoreline incurred damages as a result of First Liberty Bond's breach of the PSA.
. . . .

23. Although Pacific Shoreline has met the criteria to seek specific performance, given the unusual circumstance of the Investor Member, who has a 99.99% interest in First Liberty Bond, in not providing the Managing Member with consent to sell the property and the fact that there is an adequate remedy of law for Pacific Shoreline, the Court will award damages to Pacific Shoreline in lieu of granting specific performance.

CP at 374.

---

[10] First Liberty also challenges conclusion of law 27 that states, "First Liberty Bond's counterclaim that it is entitled to retain the earnest money is dismissed with prejudice." CP at 375; Appellant's Op. Br. at 5. However, First Liberty does not argue that its counterclaim was erroneously dismissed and that assignment of error is therefore not addressed.

The court's conclusion that Pacific Shoreline incurred damages as a result of First Liberty's breach is supported. Mr. Ufkes testified at length regarding the valuation of the Property at the time of trial versus the agreed on purchase price. Had the Prescotts not breached the PSA, Pacific Shoreline would have realized over $1,000,000 in equity by the time of trial. In addition, Pacific Shoreline was damaged because the $150,000 in earnest money was never returned.

First Liberty argues, as it has throughout this appeal, that Pacific Shoreline is not entitled to damages because it never possessed the funds to purchase the Property. This argument has been disposed of and has no merit. To the extent First Liberty argues Pacific Shoreline is not entitled to damages because it never actually performed (i.e., never paid for the Property), that argument also fails.

In support of their argument, First Liberty cites *Palmer v. Washington Securities Investment Company* in which the court stated:

> It is an elementary rule of law that, to successfully insist upon the rescission of a contract for the purchase of real estate for nonperformance by the [seller], a [buyer] must not only be without default, but he must also be able to show by competent evidence that he has performed the agreement upon his part, *or is in a position to do so, and willing to do so.*

43 Wash. 451, 455, 86 P. 640 (1906) (emphasis added). However, this quotation does not support First Liberty's position. The *Palmer* court recognized that a buyer must show he was at least in a position to perform, which Mr. Fisher demonstrated and the court found.

First Liberty also cites the unpublished case *Ebbeler v. Andrews*, No. 82225-0-I, 2022 WL 594121 (Wash. Ct. App. Feb. 28, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/822250.pdf. There, the buyers let the contingency period lapse, and there were also errors in their loan and closing documents. *Ebbeler*, No. 82225-0-I, slip op. at 3-6. As a result, the buyers were unable to close on the scheduled closing date, though the sellers were ready to close. *Id.* Further, the PSA stated that "[i]f this transaction fails to close for any reason other than default by the seller, the non-refundable deposit shall remain the property of the Seller." *Id.* at 5. Thus, the trial court concluded, and this court affirmed, that the buyers failed to perform "by failing to pay the purchase price on or before the closing date." *Id.* at 8.

In contrast, here, First Liberty was never prepared to close. Further, it would be absurd to require Pacific Shoreline to tender full performance by paying the $9.1 million purchase price for the Property while the Prescotts were being uncooperative and noncommunicative about when they would be ready to close. Indeed, the Prescotts *never* paid off the bonds. In sum, First Liberty's argument that Pacific Shoreline needed to pay the full purchase price in order to be entitled to damages fails. The court did not err and conclusion of law 23 is supported.

### *Amount of Damages*

First Liberty argues that Pacific Shoreline did not present evidence of "actual and real loss" because it never possessed the funds to buy the Property. Appellant's Op. Br.

at 67. First Liberty states, "[t]he trial court makes no findings as to how this buyer

suffered $1,300,000 of damages by being refused a property he was never qualified to

own." *Id*. This argument is unpersuasive as Mr. Fisher demonstrated he was able to

purchase the Property, and the court so found.

First Liberty next argues the court's determination of the amount of damages was

erroneous. First Liberty mainly takes issue with the court's adoption of Mr. Ufkes' trial

time valuation of the Property.

The court found, based on Mr. Ufkes' testimony, that "the current value of the

property is $10,400,000 which represents a $1,300,000 increase over the $9,100,000 PSA

purchase price." CP at 372. Relatedly, the court concluded:

> 24. Pacific Shoreline is entitled to the benefit of its bargain with First
> Liberty Bond. The Court concludes that the current value of First Liberty
> Apartments is $10,400,000. As the purchase price, as set forth in the PSA,
> was $9,100,000, the Court concludes that Pacific Shoreline's damages total
> $1,300,000. The Court will award judgment in that amount in favor of
> Pacific Shoreline with post judgment interest of 12%.
> . . . .
>
> 26. Pacific Shoreline tendered $150,000 that is currently held in escrow as
> earnest money. Since First Liberty Bond breached the PSA, the Court
> orders that the earnest money be returned to Pacific Shoreline together with
> any interest that has accrued in the escrow account.

CP at 374-75.

First Liberty really takes issue with Mr. Ufkes' valuation. However, First Liberty

admits on appeal that it did not object to Mr. Ukfes' testimony below or to his role as an

expert on the topic of valuation. First Liberty also recognizes that a trial court has

45

substantial discretion to adopt values. *Washington Beef, Inc. v. County of Yakima*, 143 Wn. App. 165, 171, 177 P.3d 162 (2008). However, for the first time on appeal, First Liberty challenges the income approach to valuation that Mr. Ufkes utilized and argues the court should not have adopted his valuation. Because this issue is raised for the first time on appeal, we could decline to address it. RAP 2.5.

Notwithstanding, the court's findings and conclusions related to the valuation of damages were not erroneous. Mr. Ufkes explained in detail how he arrived at the current valuation. He testified he analyzed "the income approach to value and . . . the sales comparison approach to value," the "current rents for the immediate market," the "current sales for the entire market," and "the maximum allowable rents based on WSHFC." RP (May 9, 2023) at 205-06. Based on this information, Mr. Ufkes stated, "In the absence of having current financials of the property, [$10.9 million] would be my estimate of the value given the sales comparables, the rent comparables, and the operations of the property with the maximum allowable rents by the [WSHFC]." RP (May 9, 2023) at 206. He also stated the value range for the Property was between $10.4 and $11.4 million. Again, First Liberty did not object to this testimony and did not produce any other expert opinion on valuation of the Property. Instead, Ms. Prescott testified regarding her opinion of the value of the Property.

Ms. Prescott testified she agreed with Mr. Ufkes' "methodology" but disagreed with his ultimate valuation. RP (May 10, 2023) at 465. She testified, "his expense

number was low, his income number was high, resulting in a net operating income that was way too high." RP (May 10, 2023) at 466. Ultimately, Ms. Prescott valued the Property at $6.242 million at the time of trial.

The court found Ms. Prescott's "analysis concerning the current value of the property . . . unpersuasive." CP at 372. It instead adopted Mr. Ufkes' low-end valuation of $10,400,000. This was not error. The court made a credibility determination and ultimately found Mr. Ufkes' testimony to be more persuasive. We will not disturb this finding on appeal. First Liberty posits the trial court did not understand Mr. Ufkes' approach to valuation and that it therefore abused its discretion by adopting his opinion. However, First Liberty points to nothing suggesting the trial court did not understand Mr. Ufkes' methodology. And, again, First Liberty never objected to his testimony or methods. Further, it is undisputed that Pacific Shoreline's $150,000 in earnest money was never returned. Given the evidence, finding of fact 191 is supported by substantial evidence and the court's findings support conclusions of law 24 and 26.

The court's damages award was proper.

ATTORNEY FEES

Both parties request their attorney fees under RAP 18.1 and the PSA's attorney fee provision. Because First Liberty has not prevailed in this appeal, it is not entitled to its attorney fees. However, Pacific Shoreline is entitled to its attorney fees under the PSA.

RAP 18.1(a) provides: "If applicable law grants to a party the right to recover reasonable attorney fees or expenses on review before [the Court of Appeals], the party must request the fees or expenses as provided in this rule." A party requesting attorney fees must dedicate a section of its opening brief to the request. RAP 18.1(b). Further, the PSA provides: "If Buyer or Seller institutes suit against the other concerning this Agreement, the prevailing party is entitled to reasonable attorneys' fees and expenses." Ex. P-1 at 9.

Below, the court awarded Pacific Shoreline its attorney fees pursuant to the above-referenced provision in the PSA. Pacific Shoreline's lawsuit and this appeal both directly concerned the PSA and whether it or First Liberty breached the PSA. Because Pacific Shoreline has prevailed on appeal, it is entitled to its attorney fees incurred for responding to this appeal pursuant to the PSA.

## CONCLUSION

We affirm the trial court's judgment in favor of Pacific Shoreline. Although the trial court erred in concluding the uncertain closing deadline contained in the earlier March Addendum controlled over the specific closing date in the November Addendum, the court's findings and conclusion that promissory estoppel and waiver, though moot, applied in the alternative was not erroneous; the court's findings and conclusions related to Pacific Shoreline's ability to close on the PSA are supported by substantial evidence; the court's findings and conclusions related to First Liberty breaching the PSA are

48

supported by substantial evidence; and the court's damages award is supported by substantial evidence and was proper. Lastly, we award Pacific Shoreline its attorney fees on appeal pursuant to the PSA.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____
Murphy, M.

_____
Staab, A.C.J.